RUTH PARKER, as Administratrix of the Estate of ERNEST PARKER, Deceased, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 29907.)

Court of Claims, June 28, 1951.

CLAIMS in negligence for wrongful death and for conscious pain and suffering.

*William A. Hyman* and *Harold W. Hayman* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Donald C. Glenn* and *Douglas L. Manley* of counsel), for defendant.

SYLVESTER, J. Ernest Parker, whose administratrix brings this action against the State for wrongful death and for pain and suffering, was admitted to the Northern Westchester Hospital in Mt. Kisco, New York, at 2:45 on the morning of November 21, 1948, having been picked up by a passerby on the roadside unconscious and in an apparently critical condition. The resident physician prescribed shock therapy and a transfusion of pooled blood plasma was administered. Parker recovered and left the hospital within a week, returning to his employment after a further period of convalescence at his home. On February 11, 1949, he was readmitted to the hospital, suffering from homologous serum jaundice or hepatitis and died on February 12, 1949. It is established by a preponderance of the proof that Parker's death resulted from the fact that the plasma used in the transfusion had been infected with the jaundice virus. The plasma was war surplus blood plasma which had been originally procured for the Army and Navy by the American Red Cross and, having been declared surplus by the War Department upon the cessation of hostilities, was dis-

tributed to health agencies in the forty-eight States for allocation to hospitals and licensed physicians. The particular plasma administered to Parker had been shipped from the Red Cross to the Westchester County Red Cross Chapter, which stored the material and delivered it untouched and in its original package to the hospital in response to its request communicated to the Westchester County Health Commissioner who had been designated by the State Commissioner of Health as District Laboratory Supply Station Custodian.

Essentially, it is claimed that the State, having knowledge of the incidence of homologous serum jaundice due to the use of pooled plasma, was guilty of negligence in the distribution of the Red Cross plasma, and that it was at fault in failing to warn physicians of this danger.

The use of blood as a therapeutic agent is a comparatively recent development. Representing in its early stages '' the final desperate gesture of the helpless physician toward a moribund patient '', the experience and knowledge acquired in the treatment of the casualties of two major wars rendered the administration of blood or blood derivatives a recognized therapeutic device used in the presence of established clinical indications. Transfusion therapy involves either the use of whole blood, plasma, which is the fraction of blood remaining after the red cells have been removed, or serum albumin, another blood derivative. The use of plasma as a substitute for whole blood was developed as the result of a medical research program instituted in 1939 and 1940 at the request of the Surgeons General of the Army and Navy, designed to meet the need for a blood product which could be stored and stockpiled, was readily transportable and could be administered without regard to the donors' blood group or without incurring the danger of reaction due to incompatibility of bloods.

Widely used during the Second World War because of its availability and convenience in administration, plasma saved thousands of lives but also brought with it the problem of the transmission of disease from an infected blood donor. It was early ascertained that homologous serum jaundice constituted one of the principal dangers. While both blood and plasma are potential vectors of disease, the problem was particularly acute in the case of pooled dried plasma, since its manufacture involved the pooling of the blood of ten to fifty donors, any one of whom might infect the entire lot. In the Army, homologous serum jaundice was second only to venereal disease in hospital bed-days involved.

When the Red Cross plasma distribution program was initiated early in 1946, the Red Cross, through its committee on blood and blood derivatives, directed the attention of the various State health departments to the possibility of virus transmission, particularly emphasizing the danger of serum jaundice. It was suggested that studies be instituted to determine as accurately as possible the incidence of this disease. In October, 1946, the New York Sanitary Code was amended to require physicians to report cases of serum jaundice to the public health authorities. Department of Health Form CD 103, kept in the offices of all physicians for the reporting of all communicable diseases as required by law, listed serum jaundice as a reportable disease and included the question, " if jaundice, did patient receive transfusion of blood, plasma or other blood product during the six months period prior to onset?" The State of New York also conducted the outstanding study in the country in this connection and, upon the conclusion of its investigations, widely publicized its findings which disclosed an incidence of serum jaundice of 4.8%. Based on this report and the data obtained from other studies, the Red Cross committee on blood and blood derivatives again considered the advisability of continuing the distribution of plasma at a meeting held in the Spring of 1947 and at later meetings, and announced its conclusion to continue plasma distribution in a report forwarded on August 15, 1947, to the various State agencies, pointing out that, in view of the lack of availability of whole blood or other relatively safe blood derivatives in many parts of the country, plasma would save many more lives than would be lost from the occasional incidence of serum hepatitis resulting from its use.

The medical evidence establishes that the use of plasma is indicated, with rare exceptions, only where other safer blood or blood products are not " available ". But availability does not consist merely in having blood or blood products in the hospital blood bank. In the apt phrase of a medical witness, " You do not just grab a bottle of blood and give it." Whole blood requires cross matching and typing in order to determine the compatibility of the donor's blood with that of the patient. The bloods must be mixed together in a test tube or on a slide and evidence of compatibility obtained. If incompatible blood is administered, there is a fifty-fifty chance of death resulting from kidney shutdown. While Witebsky's Solution, when combined with universal " O " blood, markedly lessens the danger of incompatibility, other risks are not affected. It is obviously a matter of medical judgment to determine in a particular case

whether to administer plasma immediately, despite the danger of serum jaundice, or to risk the delay involved in cross matching whole blood or to administer Witebsky's Solution and whole blood. The vital importance of the time element lies in the fact that shock induces a failure of circulation and an inadequate supply of blood to the brain, heart and other vital organs so that if circulation is not promptly re-established, the patient dies. The attending physician must therefore balance the risk incident to the immediate use of plasma against the possibility of death due to shock while awaiting the availability of safer whole blood properly selected or " O " blood with Witebsky's Solution.

Clearly, the State was not at fault because the physician in the Parker case decided, in his judgment, to administer plasma. Claimant urges that the plasma should not have been distributed at all, or if distributed, should have been recalled. But the evidence is clear that there are emergency situations in which plasma may save lives. The danger of serum jaundice known to the State, was well known to the medical profession. Physicians are required by law to report serum jaundice as a communicable disease. The Legislature, therefore, obviously assumed that the disease was known to the profession and the reference in the report form to a recent plasma transfusion is further evidence of the state of medical knowledge on this subject. Considerable discussion of the subject had appeared in health publications and in established medical journals. Also, on seven distinct occasions, specific warning of the incidence of serum jaundice was sent to the Northern Westchester Hospital.

It is urged that the Red Cross plasma should have been irradiated and that, if the plasma had been so processed, the incidence of disease would have been materially reduced. But it was not until April, 1949, after some prior experimentation, that the use of irradiated plasma was generally accepted by the medical profession.

It is also urged that the State was remiss in failing to affix a warning label to the plasma carton. There is no warrant for the assumption that the State had an obligation to instruct licensed physicians in the proper application of therapeutic agents in common use. This was no new preparation, produced and distributed by the State, such as might require it to advise physicians of its proper uses. The distribution of dried pooled plasma had been recommended and indorsed by leading physicians and medical bodies. The duty of the State, like that of

any private citizen, is to exercise due care under the circumstances. (*Sadowski* v. *Long Is. R. R. Co.*, 292 N. Y. 448, 455.) Negligence is relative to time, place and circumstances. (*Mink* v. *Keim*, 291 N. Y. 300, 304.) The evidence in this case does not justify a finding that the State was negligent in the distribution of a medical preparation developed by the medical profession, commonly used by physicians, despite known dangers, and which indisputably had saved thousands of lives.

The doctrine of *MacPherson* v. *Buick Motors Co.* (217 N. Y. 382) relied upon by claimant, is manifestly inapplicable. The manufacturer of a so-called " dangerous instrumentality " is liable for negligence in its manufacture, not only to the immediate vendee of the product, but to other persons who may reasonably be expected to come in contact with it. But here, there is no contention that there was negligence in the manufacture of the plasma and there is no negligence in merely participating in the distribution of a therapeutic agency or curative device merely because there is a known danger in its application. There is risk in the use of many drugs or medical preparations, in X-ray machines, the surgeon's knife and many other remedial instrumentalities known to the medical profession. The patient has the right to be protected against negligence. He may not complain of the fact that a preparation which has cured others failed to cure him or caused him unavoidable harm. (*Antowill* v. *Friedmann*, 197 App. Div. 230.)

A druggist who sells a prepared medicine is not responsible for the damage it may do, where the preparation is in common use. (*West* v. *Emanuel*, 198 Pa. 180; *Highland Pharmacy* v. *White*, 144 Va. 106; *Gibson* v. *Torbert*, 115 Ia. 163.) Similarly, the distributor of a commercial preparation, such as a dry cleaner, is not responsible because it explodes, the preparation being in common use; nor is there an obligation on the part of the defendant to affix a warning label to the product (*Peaslee-Gaulbert Co.* v. *McMath's Admr.*, 148 Ky. 265). Similar decisions have been rendered in respect to distribution of cholera serum which, when administered, was known to have caused fatalities. (*Hollingsworth* v. *Midwest Serum Co.*, 183 Ia. 280; *Howard* v. *United Serum Co.*, 202 Ia. 822.)

The principles here involved were summarized as follows in *Commissioners of State Ins. Fund* v. *City Chem. Corp.* (290 N. Y. 64, 69) per DESMOND, J.: " Ordinarily the *maker* of a dangerous drug who labels it as a harmless drug, is liable to the ultimate consumer injured thereby; ordinarily a mere *dealer* who vends such dangerous and mislabeled drug in its original package is

not liable without proof of some real negligence on his part. (*Thomas* v. *Winchester,* 6 N. Y. 396, discussed in *MacPherson* v. *Buick Motor Co.,* 217 N. Y. 382, at page 385, also see *DuPont De Nemours & Co.* v. *Baridon,* 73 F. 2d 26, 29.)''

The manufacturer of the dangerous drug is liable for the mislabeling, not for its manufacture. The dealer, who is in the position of the State in this case, has no obligation whatever.

In this case the product distributed was designed for use by physicians. There is a manifest distinction between selling a medical preparation to the public, who may have no knowledge of the dangers attendant upon its use, and making available a preparation to a hospital at its request, whose physicians may be expected to have knowledge of the dangers involved in utilizing the therapeutic preparation ordered by them. Ordinarily, there is no duty to give warning to the members of a profession against generally known risks. '' There need be no warning to one in a particular trade or profession against a danger generally known to that trade or profession.'' (4 Shearman and Redfield on Negligence [Rev. ed.], § 656, p. 1576.)

In *Rosebrock* v. *General Elec. Co.* (236 N. Y. 227) the General Electric Company had delivered a transformer packed with wooden blocks which created a risk of explosion unless the blocks were removed. Holding that the liability of the General Electric Company depended upon the state of knowledge of the electrical profession, the court said, per Judge CRANE (pp. 237–238):

'' I take it that an instrument which may be dangerous and is generally known to the electrical profession as a danger need not be warned against by a seller. If, for instance, transformers were usually packed with wood as were these, and the electrical trade or experts should have known that such packing was usual and that danger would arise unless the instrument was examined and packing removed, then in such case the General Electric Company would not be negligent in shipping to electric companies or experts the transformers without any instruction or caution '', and (pp. 240–241): '' If transformers, as known to the trade, were generally packed with wooden blocks in shipment, and the defendant had reason to believe that the power company knew this and would take them out, then the defendant would not be liable in selling its transformers without notice regarding the blocking because it would be guilty of no negligence. * * * If purchasers generally, according to the custom and trade, knew of the packing and caused its removal, the defendant was not negligent.''

In this case, the State of New York, even if it had manufactured and distributed the product, had every reason to believe that the risks attendant upon the use of plasma were well known to the medical profession, hospitals and licensed physicians.

Since the State here acted as a mere distributor, there is less reason to fasten a liability upon it, in the absence of any negligence on its part. (*Comrs. of State Ins. Fund* v. *City Chem. Corp.*, 290 N. Y. 64, 69, *supra.*)

Accordingly, judgment is directed dismissing the claim.

The foregoing constitutes the written and signed decision upon which judgment may be entered and it is therefore unnecessary to pass upon the proposed findings of fact and conclusions of law (Civ. Prac. Act, § 440).