Elizabeth BARRETT, Individually and as Administratrix of the Estate of Harold Blauer, Deceased, Plaintiff-Appellee,

v.

UNITED STATES of America, James Cattell, Newton Bigelow, David Marcus, Estate of Amedeo S. Marazzi, Van M. Sim, Herbert K. Greer, Frederick C. Lough, Harris J. North, William M. Creasy, John H. Derrick and George S. Leonard, Defendants,

Appeal of UNITED STATES of America, Estate of Amedeo S. Marazzi, Van M. Sim, Herbert K. Greer, Frederick C. Lough, Harris J. North, William M. Creasy and George S. Leonard, Defendants-Appellants.

Elizabeth BARRETT, Individually and as Administratrix of the Estate of Harold Blauer, Deceased, Plaintiff,

Elizabeth Barrett, Plaintiff-Appellant,

v.

UNITED STATES of America, James Cattell, Newton Bigelow, David Marcus, Estate of Amedeo S. Marazzi, Van M. Sim, Herbert K. Greer, Frederick C. Lough, Harris J. North, William M. Creasy, John H. Derrick and George S. Leonard, Defendants,

David Marcus, Defendant-Appellee.

Nos. 1007, 1246, Dockets 86–6014, 86–6028.

United States Court of Appeals, Second Circuit.

Argued April 15, 1986.

Decided July 31, 1986.

Beth A. Kaswan, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty. for the S.D. of N.Y., Susan Millington Campbell, Jane E. Booth, Asst. U.S. Attys., New York City, of counsel), for Federal appellants.

Deborah R. Linfield, New York City, (Eugene R. Scheiman, Baer Marks & Upham,

New York City, of counsel), for appellee Elizabeth Barrett.

Frederick H. Block, New York City, for appellee David Marcus.

Jane Levine, Asst. Atty. Gen., State of N.Y. (Robert Abrams, Atty. Gen. of the State of N.Y., Robert Hermann, Sol. Gen., New York City, of counsel), for amicus curiae State of N.Y.

Before MANSFIELD, KEARSE and CARDAMONE, Circuit Judges.

MANSFIELD, Circuit Judge:

Four defendants who were at all relevant times federal attorneys (Herbert K. Greer, Frederick C. Lough, Harris J. North and George S. Leonard) appeal from an order of the Southern District of New York, Chief Judge Constance Baker Motley, denying their motion to dismiss on grounds of absolute and qualified immunity an action against them by Elizabeth Barrett, Administratrix of the estate of Harold Blauer, deceased. Blauer died in 1953 as the result of injections administered to him by a New York State hospital of a synthetic mescaline compound furnished by the United States Army Chemical Corps as part of an experimental program. His estate seeks damages in the present action on the ground that following Blauer's death appellants and defendant David Marcus, then Assistant Attorney General of the State of New York, actively concealed the federal government's participation in causing the death and conspired to violate the estate's rights in a New York Court of Claims action which the estate brought in 1955 against the State of New York seeking damages for Blauer's wrongful death. Plaintiff cross-appeals from the district court's order insofar as it dismissed on grounds of absolute immunity her claim against defendant Marcus. We affirm.

The events that are the subject of this litigation date back to 1952 and are described in earlier opinions of this court, *Barrett v. United States*, 689 F.2d 324 (2d Cir.1982), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983), and of the district court, *Barrett v. Hoffman*, 521 F.Supp. 307 (S.D.N.Y.1981), *rev'd sub nom. Barrett v. United States, supra,* and *Barrett v. United States*, 622 F.Supp. 574 (S.D.N.Y.1985), familiarity with which is assumed. In December 1952, Blauer, 42 years old, was admitted voluntarily to the New York State Psychiatric Institute (NYSPI) for psychotherapeutic treatment for depression. Shock therapy at another hospital had been unsuccessful in treating the illness. On January 8, 1953, after being injected by NYSPI personnel with a synthetic mescaline derivative, which was one of a series of injections administered to him during his stay at NYSPI, he died. The mescaline derivative had been supplied by the United States Army Chemical Corps pursuant to contracts between its procurement agency and NYSPI. NYSPI undertook to test the psychiatric effect of the compound on human subjects so that the Chemical Corps could determine its suitability as a chemical warfare agent. The contracts prohibited NYSPI from disclosing any information developed by it in the performance of its obligations thereunder.

The New York City Medical Examiner's death certificate listed the cause of Blauer's death as "Coronary arteriosclerosis; sudden death after intravenous injection of a mescaline derivative, January 8, 1953." A NYSPI medical record, which was disclosed to Blauer's estate, stated that the drug administered to Blauer was "for diagnostic and therapeutic purposes," and resulted in an "unexpected and totally atypical response". This information as to the cause of death was conveyed shortly after Blauer's death to his estranged wife, Amy Blauer, and to the law firm which she retained for the purpose of investigating the matter and taking appropriate legal action. In this action the estate claims that in fact the injections of the synthetic mescaline derivative were not for a therapeutic purpose but were performed pursuant to the experimental program conducted under NYSPI's contracts with the Army Chemical Corps to determine the clinical effect of the agent on Blauer's behavior. It is also asserted that, if the Medical Examiner had

been apprised of the true facts, his autopsy report would have read, "Convulsive seizures, hypotension and cardiorespiratory arrest immediately following and due to intravenous injection of a mescaline compound for investigative purposes."

In April 1953 Amy Blauer, then Administratrix of Blauer's estate, brought an action for damages against the State of New York in the New York Court of Claims, alleging that Blauer's death was caused by negligence of the NYSPI in injecting him with a toxic and dangerous compound. Defendant David Marcus, then Assistant Attorney General of the State of New York, was assigned to defend the case. His investigation uncovered the Army Chemical Corps' involvement in furnishing the mescaline derivative and arranging for its administration. On January 4, 1954, the Court of Claims authorized production of the NYSPI hospital records bearing on the treatment of Blauer and examination of the doctors involved (which was scheduled for January 12, 1954, but was postponed). Marcus, recognizing that some of the information sought was classified as "secret" by the Army, conferred with the Army's litigation division on January 13–14, 1954, about possible settlement of the case under an agreement whereby the federal government would pay part of any figure to be agreed upon between Marcus and the Blauer estate.

After the matter was brought to the attention of the Department of Justice a conference of federal counsel and medical personnel was held in early July 1954. According to records relied on by the estate, at this meeting apprehension was expressed by Dr. Marazzi of the Chemical Corps and Dr. Paul Hoch, the NYSPI medical official in charge of administering the mescaline compound to Blauer, about claims of malpractice that might be anticipated. The parties concluded that the security category of the compound should be declassified, that the Department of the Army would explore the availability of federal funds to settle the suit against the State of New York, and that if it became necessary to reveal the source of the compound Dr. Hoch would be expected to testify as an expert, indicating that the Army *Medical* Corps was the supplier. Another conference was held on July 12, 1954, in Washington, attended by various government officials including Marcus and appellant Harris J. North, then an attorney with the U.S. Army Judge Advocate General Corps; appellant Herbert K. Greer, then Legal Advisor to the Chief Chemical Officer, Army Chemical Corps; and appellant George S. Leonard, then first assistant to the Assistant Attorney General for the Civil Division, United States Department of Justice.

According to a "Chronological Statement of Facts" prepared by the Army's Office of the Judge Advocate General, at the July 12, 1954 meeting Marcus sought to determine the extent to which the Army would contribute toward the settlement of the case. The principal concern of the federal representatives was protection against disclosure of the Army's involvement and of the purpose of the Army's classified experimentation program. However, Mr. Leonard, although not objecting to declassification by the Army of the compounds used (which was shortly thereafter done by the Army), specified that if the source of the compound must be revealed it should be attributed to the Army *Medical* Corps, not to its Chemical Corps, but that the latter's laboratory reports could be revealed. Dr. Hoch stated that he would not have used the new compound for experimental purposes but for the NYSPI's contract with the Army and that the experimental nature of the treatment made it a departure from accepted medical practice, which, if disclosed, would support a finding of negligence and an award of damages. According to the report of the meeting by the Judge Advocate General, Mr. Leonard "forcibly informed Mr. Marcus that the pretrial procedures and any further proceedings should be limited to the medical aspects of the case" and that disclosure of the Army–NYSPI contract, its purpose and the results of the experiments would be objectionable. He further

"stated to Army representatives it was his opinion that the case would be worth between $60,000 and $75,000 in the event the full attendant circumstances are revealed to the court and should be settled in order to avoid any possible disclosure of the Army's interest and the experiments of the Chemical Corps with mescaline as a chemical warfare agent. He urged that the Department of the Army make every effort to make sufficient funds available to settle this suit."

Appellant North later recommended to appellant Greer that the Chemical Corps' contracts with NYSPI be removed from New York to the Chemical Corps Procurement Agency in Maryland where "they would be beyond subpoena power of the plaintiff [Amy Blauer] in this action [in the New York State Court of Claims]."

In recognition of the Army's interest in not disclosing the Chemical Corps' involvement in the administration of its mescaline derivatives to Blauer, Marcus repeatedly postponed the pretrial examinations of NYSPI doctors by Amy Blauer's counsel. Marcus did, however, furnish to the estate's counsel part of the NYSPI hospital records with respect to the treatment of Blauer, which were not classified by the Army. These consisted of "Progress Notes" summarizing on a daily basis the doctors' observations of Blauer from December 5, 1952, to January 8, 1953 (date of death). The records stated that Blauer had been subjected to a "drug study for diagnostic and therapeutic purposes" which resulted in an "unexpected and totally atypical response." It is claimed by the estate that the State of New York, however, did not turn over NYSPI classified records that would have revealed that the injections were part of an Army Chemical Corps experimental drug program conducted for chemical warfare research. The estate contends that it was misled by the State into the belief that it had received all relevant hospital records with respect to Blauer. Marcus pursued settlement negotiations with the Blauer estate's counsel, arriving at a tentative figure of $15,000. Marcus requested an assurance from the Army that one-half of this figure would be reimbursed by the Department of the Army, which thereupon requested the Chemical Corps to draw a check for $7,500 to be used for that purpose.

At no time was the estate or its counsel ever informed of the involvement of the United States Army Chemical Corps in the administration of the mescaline derivative to Blauer, that it was part of a Chemical Corps experimental program, that the injection causing his death was the fifth in a series to which he had reacted unfavorably, and that but for the NYSPI's contract with the Army the mescaline derivative would not have been administered to Blauer. If his estate had pursued its right to examine the relevant NYSPI files and witnesses it probably would have uncovered all or most of these facts or have been met with a refusal to answer or make a disclosure on grounds of executive privilege. However, allegedly in the belief that it faced the risk of not proving its negligence claim against the state since mescaline (as distinguished from the experimental compound) was recognized as sometimes used for diagnostic or therapeutic purposes, the estate agreed, in 1955 negotiations with Marcus, to settle its claim of wrongful death for $15,000.

Under procedures in effect in 1955 the State of New York could not settle the case without presenting evidence of prima facie liability to the Court of Claims, which would then make a finding of liability and award damages in the amount agreed upon by the parties. Before following this procedure Marcus revealed the Army's involvement to the judge in an *ex parte* conference. The Judge thereupon increased the settlement figure to $18,000. At the court proceeding that followed, Marcus introduced certain NYSPI medical records (the exact scope of which is not shown in the record) by handing them directly to the judge but did not turn them over to the estate's counsel. Nor did the latter insist on examining them, allegedly for the reason that the amount of the settlement had already been agreed upon and the court proceeding was viewed as a formality. Dr.

Hoch testified that Blauer's death was caused by the injection of a mescaline compound and that the administration of the drug was not in accordance with generally accepted medical practice. However, at no time was the estate made aware of the Army's involvement in the injections. Nevertheless, Marcus prepared a release, which was signed by Amy Blauer, Administratrix, that in exchange for $18,000 released not only the State and persons immediately involved but the "governmental body or agency which furnished the drug used in the drug study which resulted in the death of Harold Blauer." On July 7, 1955, the Court of Claims entered an order awarding $18,000 to the Blauer estate in settlement of its claim. Unbeknownst to the estate, the Department of the Army had on June 9, 1955, paid $9,000 to the State of New York to cover one-half of the $18,000 settlement.

The Army's involvement in the injections and the fact that the mescaline derivatives were furnished as part of its chemical warfare testing program remained secret for 20 years and would have continued to do so but for the public disclosure of these facts by the Secretary of the Army on August 12, 1975. In the meantime Amy Blauer, administratrix of Blauer's estate, had died. Plaintiff Elizabeth Barrett, her daughter and successor-administratrix of his estate, after failing in an effort to reopen the case in the New York Court of Claims, *Barrett v. State of New York*, 85 Misc.2d 456, 378 N.Y.S.2d 946 (Ct.Cl.1976), commenced three actions in the Southern District of New York against the United States and various federal and New York State officials seeking damages for herself and the estate for Blauer's wrongful death and the alleged cover-up of the Army's involvement in causing the death. Federal jurisdiction was invoked against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* (FTCA), and against the individual defendants under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Federal Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The three actions are *Barrett v. United States*,

*et al.*, 76 Civ. 1061; *Barrett v. Arthur, et al.*, 78 Civ. 3762; and *Barrett v. Hoffman, et al.*, 76 Civ. 381.

Following this Court's reversal of the district court's dismissal of the actions as time-barred, 689 F.2d at 324, the defendants moved to dismiss the complaint or for summary judgment. Among other grounds, appellants and Marcus asserted that by reason of their positions and functions in the matter, they were either absolutely immune from suit or, in the alternative, entitled to qualified immunity. In a reasoned opinion, 622 F.Supp. 574, Judge Motley held that, although the interest of a government attorney in defending a civil suit for damages is not as great as that of a prosecutor in enforcing criminal laws, former Assistant Attorney General Marcus was, in view of the Supreme Court's decisions in *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), and *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), entitled to the same absolute immunity accorded to judges, witnesses, prosecutors and quasi-judicial officers, since his conduct complained of was undertaken on behalf of the State of New York during the course of and in connection with ongoing litigation. The federal attorneys, on the other hand, were held not entitled to absolute immunity because they did not act as counsel in any pending or prospective lawsuit, the would-be plaintiff being wholly unaware of a potential lawsuit against the United States. Qualified immunity was also denied to the federal attorneys because they "should have been aware that they were depriving plaintiffs of their property right by their alleged actions" in concealing a possible FTCA action by the plaintiff against the United States.

The federal-attorney defendants appeal from the denial of any immunity and plaintiff cross-appeals from the grant of absolute immunity to the defendant Marcus. Although the district court's order denying the federal-attorney defendants' motion to dismiss is not a "final judgment" as that term is ordinarily used in 28 U.S.C. § 1291, it is appealable under the collateral

order doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *Mitchell v. Forsyth*, —— U.S. ——, 105 S.Ct. 2806, 2815–17, 86 L.Ed.2d 411 (1985). Although dismissal of plaintiff's claim against Marcus was not a final judgment, and Rule 54(b) certification was not entered as to that dismissal, since all of the issues involved in plaintiff's cross-appeal of that order are involved in the federal defendants' appeal, we accept pendent jurisdiction of the cross-appeal. *See San Filippo v. United States Trust Co.*, 737 F.2d 246 (2d Cir.1984), *cert. denied*, 470 U.S. 1035, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985).

## DISCUSSION

■ Since the principal issue on this appeal is what immunity, if any, may properly be asserted as a defense by each of the defendants, a brief review of the principles governing immunity is essential. Two kinds of immunity have been recognized under certain circumstances, absolute and qualified. Absolute immunity from liability has been accorded to a few types of government officials whose duties are deemed as a matter of public policy to require such protection to enable them to function independently and effectively, without fear or harassment. These include the President of the United States, *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), judges, *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), legislators, *Eastland v. United States Serviceman's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1976), prosecutors, *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), and high executive officers engaged in adjudicative or quasi-judicial functions, *Butz v. Economou*, 438 U.S. 478, 513–17, 98 S.Ct. 2894, 2914–16, 57 L.Ed.2d 895 (1978). However, as the Court recently stated in *Malley v. Briggs*, —— U.S. ——, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)

"Our cases also make plain that '[f]or executive officers in general, ... qualified immunity represents the norm.'

*Harlow, supra*, [457 U.S. 800] at 807 [, 102 S.Ct. 2727, 73 L.Ed.2d 386].[2] Like federal officers, state officers who 'seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope.' *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978).

2. *Harlow* was a suit against federal, not state, officials, but as we stated in deciding the case, it is '"untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."' 457 U.S. at 818, n. 30, 102 S.Ct. at 2738 n. 30 (quoting *Butz v. Economou*, 438 U.S. at 504, 98 S.Ct. at 2909)."

Thus absolute immunity is of a "rare and exceptional character." *Cleavinger v. Saxner*, —— U.S. ——, 106 S.Ct. 496, 501, 88 L.Ed.2d 507 (1985). For instance, although the Attorney General of the United States is accorded absolute immunity in his direction or conduct of litigation involving the government, in view of the risk that disappointed litigants will seek to relitigate a lost case by suing him, he is not entitled to such immunity for his performance of national security tasks since they do not pose the same risks. *Mitchell v. Forsyth*, —— U.S. ——, 105 S.Ct. 2806, 2813–14, 86 L.Ed.2d 411 (1985). In *Forsyth* the Court pointed to three factors to be considered in determining whether a government official should be given absolute immunity for a particular function: (1) whether a historical or common law basis exists for immunity from suit arising out of performance of the function; (2) whether performance of the function poses obvious risks of harassing or vexatious litigation against the official, and (3) whether there exist alternatives to damage suits against the official as a means of redressing wrongful conduct. *Id.* A state or federal attorney performing a prosecutorial function meets these tests. *Imbler, supra*, 424 U.S. at 409, 96 S.Ct. at 984.

■ The absolute immunity accorded to government prosecutors encompasses not only their conduct of trials but all of their

activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation, including presentation of evidence to a grand jury to initiate a prosecution, *Lee v. Willins,* 617 F.2d 320 (2d Cir.), *cert. denied,* 449 U.S. 861, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980), activities in deciding not to do so, *Dacey v. Dorsey,* 568 F.2d 275, 278 (2d Cir.), *cert. denied,* 436 U.S. 906, 98 S.Ct. 2238, 56 L.Ed.2d 405 (1978), and conduct of plea bargaining negotiations, *Taylor v. Kavanagh,* 640 F.2d 450 (2d Cir.1981).

In *Butz v. Economou, supra,* 438 U.S. at 512–17, 98 S.Ct. at 2913–16. The Supreme Court analogized government administrative proceedings to criminal prosecutions and held that government officials *initiating* such proceedings and agency attorneys introducing evidence and cross-examining witnesses in them are absolutely immune from liability in damages for their decisions. The Court reasoned that otherwise such attorneys "might hesitate to bring forward some witnesses or documents" for fear that the proof might turn out to be false, subjecting them to liability. *Id.* at 517, 98 S.Ct. at 2916. In our view the same principles should *a fortiori* govern the government attorney's initiation of civil litigation in a state or federal court. The controversial nature of the proceeding, the risk that a losing civil defendant will seek to retaliate by a suit attacking the propriety of the government attorney's conduct, and the existence of alternative safeguards against the attorney's misconduct (e.g., professional disciplinary proceedings, discovery and cross-examination) militate in favor of absolute immunity.

▮ It is urged that these factors do not call for the same result when the government attorney *defends* a civil suit. We disagree. It is true that the successful plaintiff in such litigation, having gained some or all of the relief sought, is unlikely to follow up with a harassing suit against the defending government lawyer. Also, the risk to the successful government civil defense attorney of becoming the victim of vexatious litigation by a disappointed litigant is probably less than if the government attorney had initiated the litigation. However, that risk is far from non-existent. His image may not be comparable to that of a prosecutor, but it is not difficult to conceive of situations where, although the government is the defendant, its counsel asserts affirmative defenses (e.g., fraud, illegality, or statute of limitations) tending to upset or excite resentment on the part of the civil plaintiff. To make the immunity accorded a government attorney in the conduct of litigation on its behalf turn on whether the lawyer acts in the capacity of counsel for "plaintiff" or "defendant" at any given moment in the proceedings would tend to allow form to triumph over substance. Although government defense counsel, not having selected the other party as the target of the litigation, is in a more passive position than a prosecutor or plaintiff's representative, he nevertheless functions in an adversarial arena where "there is, if not always a winner, at least one loser," *Forsyth, supra,* 105 S.Ct. at 2813, and since he is charged with a public trust he should not be inhibited in the faithful performance of his duties by the threat of harassing lawsuits against him. His function as a government advocate therefore entitles him to absolute immunity, which is "necessary to assure that ... *advocates* ... can perform their respective functions without harassment or intimidation." *Butz v. Economou, supra,* 438 U.S. at 512, 98 S.Ct. at 2913 (emphasis supplied).

Extension of absolute immunity to defending government litigators finds common law and historical support in the broader principle that "the immunity which is extended to the judges is in like manner extended to the attorneys in the presentation of a client's case to the court or the jury." *Yaselli v. Goff,* 12 F.2d 396, 402 (2d Cir.1926), *aff'd,* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927). Trial counsel, for instance, were early held immune from liability for statements made in ongoing litigation that are pertinent to the subject matter of the judicial proceedings, even though they might otherwise be actionable, *Hoar v. Wood,* 3 Metc. 193, 197–98 (Mass.1841);

*Munster v. Lamb,* 11 Q.B.D. 588 (1883), a doctrine that continues to be recognized. *See Blanchette v. Cataldo,* 734 F.2d 869, 877 (1st Cir.1984); *United States v. Hurt,* 543 F.2d 162, 167 (D.C.Cir.1976); *Brown v. Collins,* 402 F.2d 209, 213 (D.C.Cir.1968). Although the immunity may occasionally preclude redress for defamation, it recognizes the free speech needs of litigating adversaries. Moreover, an alternative remedy for abuse exists in the availability of professional disciplinary proceedings.

▮ With these principles in mind, we turn to the present case in which, upon the undisputed facts, the district court upheld defendant Marcus' defense of absolute immunity and rejected the absolute immunity defense asserted by the federal attorneys. With respect to Marcus, little discussion is needed. It is beyond dispute that his sole involvement was at all times as Assistant Attorney General of the State of New York representing that state as its attorney in the action brought by Blauer's estate against it in the Court of Claims for damages caused by the negligence of the NYS-PI, a state institution, in the treatment of Blauer. Under the governing principles we have outlined, the district court's decision upholding his claim of absolute immunity must be upheld. The fact that he may or may not have engaged in questionable or harmful conduct during the course of his representation of the State in that litigation is irrelevant. The immunity attaches to his function, not to the manner in which he performed it.

▮ On the other hand, upon the present record, the claim of the federal-attorney appellants to absolute immunity must just as surely be rejected. They contend that all federal attorneys acting "in anticipation of a lawsuit" are cloaked with absolute immunity. We need not define the outer boundary of the absolute protection granted to government lawyers defending civil suits, because the conduct of the federal appellants clearly falls outside it. The federal attorneys did not act as counsel for any of the parties in litigation relating to the death of Blauer. On the contrary, their efforts were devoted mainly to avoiding involvement of the federal government or federal officials in such proceedings by keeping the estate ignorant of the role played by the United States Government. Their conduct was not public and was unknown to those affected by it. *Cf. Forsyth, supra,* 105 S.Ct. at 2813. Indeed, the open conflict of a court battle, which creates the need for protective immunity to enable the government attorney to perform his duty fearlessly, was totally absent. Finally, acceptance of the view urged by the federal appellants would result in a blanket grant of absolute immunity to government lawyers acting to prevent exposure of the government to liability. Given the "rare and exceptional character" of absolute immunity, *Cleavinger, supra,* 106 S.Ct. at 501, we must reject this proposed wide-ranging immunity.

Since the federal-attorney appellants contend in the alternative that they are at least entitled to qualified immunity, the elements of that doctrine must also be examined. Government officials who do not qualify for absolute immunity may nevertheless in an appropriate case be entitled to assert the affirmative defense of qualified immunity, which shields them "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Officials entitled to assert qualified immunity include a state governor and his aides, *Scheuer v. Rhodes,* 416 U.S. 232, 247–50, 94 S.Ct. 1683, 1691–93, 40 L.Ed.2d 90 (1974), cabinet and federal agency officials in the Executive Branch, *Butz v. Economou, supra; Mitchell v. Forsyth, supra,* public school administrators, *Wood v. Strickland,* 420 U.S. 308, 318, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975), and law enforcement officers, *Malley v. Briggs, supra.*

▮ The federal-attorney appellants' entitlement to qualified immunity by reason of their status as government officials depends on whether reasonable persons

would have recognized at the time that their conduct violated any clearly established statutory or constitutional norms, *Harlow, supra,* 457 U.S. at 818, 102 S.Ct. at 2738, and whether the appellees are seeking recovery based on the violation of such norms. *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 3020 n. 20, 82 L.Ed.2d 139 (1984). Appellees claim that the federal attorneys unconstitutionally deprived the estate of a property interest in its causes of action against the United States Government and various federal officials. The applicability of qualified immunity turns on whether (1) the estate had a legally cognizable claim for damages against the federal government and/or individual federal officials that constituted a property interest under the United States Constitution, and (2) whether the alleged actions of the federal attorneys interfered with the vindication of any claim to the extent that they infringed upon this property right in violation of the Constitution.

It is readily apparent that knowledge of the government's role in Blauer's death would have been critically important to the estate's assessment of its legal rights. There can be no doubt that the Army Chemical Corps' alleged instigation of and participation in the experimental administration of the mescaline derivative to Blauer without his consent (indeed, it is claimed that the hospital records show it to have been over his objection) would have provided the basis for a valid claim of violation of Blauer's underlying right to be free from unjustified and unconsented to invasion of his person, amounting to a battery. The alleged conduct would in 1953 have amounted to both a tort and a violation of Blauer's constitutional rights. Although the availability of a damages remedy against the government under the Federal Tort Claims Act, 28 U.S.C. § 2674, may, because of sovereign immunity principles, ahve been uncertain in 1953, *see* 28 U.S.C. § 2680(a); *Dalehite v. United States,* 346 U.S. 15, 30–34, 73 S.Ct. 956, 965–67, 97 L.Ed. 1427 (1953); *Nevin v. United States,* 696 F.2d 1229 (9th Cir.), *cert. denied,* 464 U.S. 815, 104 S.Ct. 70, 78

L.Ed.2d 84 (1983); *Beins v. United States,* 695 F.2d 591, 614 & n. 31 (D.C.Cir.1982); *Costley v. United States,* 181 F.2d 723, 724–25 (5th Cir.1950); *Griggs v. United States,* 178 F.2d 1, 3 (10th Cir.1949), *rev'd on other grounds sub nom. Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), Blauer's right to be free from a battery at the instigation of Army Chemical Corps officials could hardly be questioned at that time. Sovereign immunity could not at that time be availed of by them for their participation in such wrongful conduct. In sanctioning an unconsented-to invasion of Blauer's body by experimental use of a deadly drug, they would not be exercising powers delegated to them by the government, since they were not authorized to violate the Constitution by arbitrarily depriving Blauer of life and liberty. The governing principle at the time was that a government official could not escape personal liability for tortious action when his conduct exceeded his authority by violating statutory or constitutional requirements. *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950); 2 *F. Harper & F. James, The Law of Torts,* § 29.10, at 1642–43 (1956); *see Butz, supra,* 438 U.S. at 493–95, 98 S.Ct. at 2904–05. Even *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), which extended the breadth of immunity granted to federal officials, "did not purport to protect an official who has not only committed a wrong under local law, but has also violated those fundamental principles of fairness embodied in the Constitution." *Butz, supra,* 438 U.S. at 495, 98 S.Ct. at 2905.

Thus, we conclude that in 1953 it was readily apparent that the alleged conduct of Army Chemical Corps officials in instigating and joining with the State of New York in undertaking the unconsented to experimental injections was an actionable wrong. The estate's right to sue for damages was governed by the law of New York, the state where the alleged wrongful acts occurred. *Richards v. United States,*

369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Nolan v. United States*, 186 F.2d 578 (4th Cir.1951). Under New York law one participating in the administration of a dangerous drug to human subjects without adequate warning or notice of the risk involved could be held responsible in damages for the consequences. *Campo v. Scofield*, 276 App.Div. 413, 95 N.Y.S.2d 610, 612, aff'd, 301 N.Y. 468, 95 N.E.2d 802 (1950); *Noone v. Fred Perlberg, Inc.*, 268 App.Div. 149, 49 N.Y.S.2d 460 (1944), aff'd, 294 N.Y. 680, 60 N.E.2d 839 (1945); *Marcus v. Specific Pharmaceuticals, Inc.*, 82 N.Y.S.2d 194 (Sup.Ct.1948); *Wechsler v. Hoffman LaRoche, Inc.*, 198 Misc. 540, 99 N.Y.S.2d 588 (Sup.Ct.1950); *Parker v. State*, 201 Misc. 416, 421–22, 105 N.Y.S.2d 735, 740 (Ct.Cl.1951), aff'd, 280 App.Div. 157, 112 N.Y.S.2d 695 (1952).

In the 1953–1955 period it was well settled that the estate's underlying right to sue the alleged Army Chemical Corps wrongdoers for damages for causing Blauer's death constituted a property right protected by the Constitution from arbitrary governmental interference. Indeed the Supreme Court as far back as 1882 had stated, "a vested right of action is property in the same sense in which tangible things are property, and is equally protected from arbitrary interference". *Pritchard v. Norton*, 16 Otto 124, 106 U.S. 124, 132, 1 S.Ct. 102, 107, 27 L.Ed. 104 (1882). This principle, although more recently described as "arguable" in *Martinez v. California*, 444 U.S. 277, 281, 100 S.Ct. 553, 557, 62 L.Ed.2d 481 (1980), had been repeatedly recognized by 1953 in a number of cases. *See Gibbes v. Zimmerman*, 290 U.S. 326, 332, 54 S.Ct. 140, 142, 78 L.Ed. 342 (1933); *Forbes Pioneer Boat Line v. Board of Comm.*, 258 U.S. 338, 42 S.Ct. 325, 66 L.Ed. 647 (1922); cf. *Fidelity & Deposit Co. v. Arenz*, 290 U.S. 66, 68, 54 S.Ct. 16, 17, 78 L.Ed. 176 (1933) (" 'Property' is a word of very broad meaning and when used without qualification, expressly made or plainly implied, it reasonably may be construed to include obligations, rights and other intangibles as well as physical things").

Whether the alleged "cover-up" conduct of the federal-attorney defendants violated the estate's foregoing property right presents a closer question. The federal-attorney defendants were neither parties to the ongoing litigation between the estate and the State of New York nor the subjects of discovery in that action. They therefore were not under any duty to volunteer to the estate information that would alert it to the existence of a claim against the federal government and certain of its officials for Blauer's wrongful death. On the other hand, the government officials were not free to arbitrarily interfere with the estate's vindication of its claims. *Pritchard, supra*, 106 U.S. at 132, 1 S.Ct. at 107. Unconstitutional deprivation of a cause of action occurs when government officials thwart vindication of a claim by violating basic principles that enable civil claimants to assert their rights effectively. Cf. *Goldberg v. Kelly*, 397 U.S. 254, 267–71, 90 S.Ct. 1011, 1020–22, 25 L.Ed.2d 287 (1970); *Greene v. McElroy*, 360 U.S. 474, 496–97, 79 S.Ct. 1400, 1413–14, 3 L.Ed.2d 1377 (1959). Although in 1953–55 courts may not have explicitly stated this principle, they had clearly ennunciated that the Constitution protects causes of action from arbitrary interference, *id.*, and state law clearly proscribed particular forms of meddling. Thus, the officials owed a duty to the estate under currently prevailing law not to suborn perjury by any witness in the ongoing litigation and not to induce Marcus to evade disclosure to the estate, in the course of discovery in the Court of Claims case, of the Army Chemical Corps' complicity in Blauer's death.

Violation of these duties was also a crime and could have been prosecuted under provisions of the New York Penal Law as it stood in 1953–55. *See* N.Y. Penal L. § 580(6) (repealed 1967) (conspiracy to obstruct justice); *id.*, at § 814 (suppression of evidence); *id.*, at § 1620, *et seq.* (subornation of perjury). Moreover, the estate would have had a damage remedy against perpetration of these wrongs. New York Penal Law § 273 (superseded in 1967 by N.Y.Judiciary L. § 487), authorized an in-

jured person to recover treble damages from an attorney "guilty of any deceit or collusion with intent to deceive the court or any party."[1] The statute has been construed as providing a civil remedy to protect a party against wrongful conduct by a deceitful attorney. See *In re Bregoff,* 258 App.Div. 551, 557, 17 N.Y.S.2d 816, 821 (1940); *Nones v. Security Title and Guaranty Co.,* 4 Misc.2d 1057, 162 N.Y.S.2d 761 (Sup.Ct.1956); *Fields v. Turner,* 1 Misc.2d 679, 147 N.Y.S.2d 542 (Sup.Ct.1955).

Nothing in § 273 limits the action to one by a party against an attorney for another party in a case. But even if that were so, since Marcus was an attorney for the State of New York in the Court of Claims case the federal-attorney defendants could be jointly liable for conspiring with him to deceive the estate in that action through use of perjury and suppression of evidence. *See Werbelovsky v. Rosen,* 260 App.Div. 222, 226, 21 N.Y.S.2d 88, 92 (1940); *Erbe v. Lincoln Rochester Trust Co.,* 1 Misc.2d 413, 418, 145 N.Y.S.2d 788, 793 (Sup.Ct. 1955), *aff'd,* 2 App.Div.2d 242, 154 N.Y.S.2d 179 (1956); *Lonsdale v. Speyer,* 249 App. Div. 133, 141, 291 N.Y.S. 495, 504–05 (1936) (one who cooperates with a fiduciary in breaching his obligations may be held liable to beneficiaries); *Goodman v. Goodman & Suss Clothes Corp.,* 68 N.Y.S.2d 281, 185 (Sup.Ct.1947) (those who conspire with directors to breach their fiduciary duty are liable for any damages).

Regardless of New York Penal Law § 273, a fraudulent scheme that is greater in scope than the issues in the action in which perjurious testimony was given could under New York law in 1953–55 be the subject of an action for damages on the part of the party aggrieved. *See Verplanck v. Van Buren,* 76 N.Y. 247 (1879); *Burbrooke Mfg. Co. v. St. George Textile*

*Corp., et al.,* 283 App.Div. 640, 642, 129 N.Y.S.2d 588, 591–92 (1954); *Anchor Wire Corp. v. Borst,* 277 App.Div. 728, 729–30, 102 N.Y.S.2d 871, 873 (1951). The continued viability of this principle is recognized. *Newin Corp. v. Hartford Accident & Indemn. Co.,* 37 N.Y.2d 211, 217, 371 N.Y. S.2d 884, 890, 333 N.E.2d 163, 169 (1975).

In the present case the estate claims that the federal-attorney defendants crossed the line from mere silence to active interference with the estate's rights in its pending Court of Claims action. Dr. Paul Hoch, for instance, is alleged to have been counseled by the federal-attorney defendants not to reveal the Army Chemical Corps' involvement in supplying the mescaline derivative or the purpose of the injections. Instead, while conceding that the injections were not in accordance with generally accepted medical routine, he testified falsely before the New York Court of Claims that the drug was a derivative compound used quite commonly by the profession for purposes of diagnosing certain types of psychiatric ills, that it had been administered "for diagnostic purposes to Mr. Blauer," and that "Mr. Blauer's condition could best be diagnosed and treatment thereafter given if he could be observed during a psychotic state under controlled conditions." In fact, according to the estate, Dr. Hoch was well aware that the mescaline derivative was a new compound not being administered for diagnostic or therapeutic purposes but as an experiment to study its effect for chemical warfare purposes.

The estate further claims that the federal-attorney defendants violated its rights in its pending litigation by inducing Marcus to improperly conceal the Army Chemical Corps' involvement in NYSPI's collaborative chemical warfare experiment. Marcus

---

1. New York Penal Law § 273, as it existed in 1953–55 provided:

"§ 273. Misconduct by attorneys
"An attorney or counselor who:
  "1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; or,
  "2. Wilfully delays his client's suit with a view to his own gain; or, wilfully receives any

money or allowance for or on account of any money which he has not laid out, or become answerable for,
  "Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by this chapter, he forfeits to the party injured treble damages, to be recovered in a civil action."

allegedly effectuated the concealment by turning over to the estate, in response to a request under a court-authorized discovery order, medical records indicating that the injections of Blauer were for diagnostic and therapeutic purposes but withholding NYSPI medical records showing that the injections were part of an Army Chemical Corps experimental program for chemical warfare purposes. It is alleged that the concealment was further effectuated by Marcus' knowing participation in an alleged fraud upon the estate through his elicitation of Dr. Hoch's false testimony at the New York Court of Claims hearing, his dextrous handling of the NYSPI medical records at that hearing so that they would not be examined by the estate's counsel, his submission of findings of fact that concealed the Army Chemical Corps' involvement and misrepresented the administration of the drug as for "therapy", and his inducement of the estate to sign a release prepared by him which barred claims against the "government body" supplying the lethal derivative with which Blauer was injected without revealing that the "government" supplier was not the State of New York, as the estate assumed, but the Army Chemical Corps.

The estate further contends that the federal-attorney defendants' unlawful interference with their rights in the pending New York Court of Claims action is confirmed by Marcus' deposition testimony in the present case to the effect that they forced him to engage in the foregoing tactics under the threat that if he did not do so he might be prosecuted personally for violation of the federal Espionage Act. Lastly, the estate claims that in order to prevent it from obtaining discovery in its Court of Claims action of the contracts between the Army Chemical Corps Procurement Agency and the NYSPI, which would have revealed that the mescaline derivatives were administered to Blauer pursuant to an agreement with the Army Chemical Corps

for testing chemical warfare agents on human subjects, defendant Harris J. North, instructed NYSPI to transfer the relevant contract records to the Army Chemical Center in Maryland where, according to North's October 19, 1954, memorandum "they would be beyond the subpoena power of the plaintiff in this action [in the New York Court of Claims]."

In our view, proof of the foregoing conduct on the part of the federal-attorney defendants would preclude their resort to qualified immunity as a defense in the present action. Their alleged conduct would amount not only to active participation in a conspiracy to deceive the estate by concealing material evidence in its pending action in the New York Court of Claims, for which they could be held liable under currently effective law,[2] but a violation of the estate's constitutional rights in a potential action against both the Army Chemical Corps and the federal officials participating in the unconsented-to lethal injections of Blauer, which was currently recognized as a property right entitled to protection. *Gibbes v. Zimmerman, supra; Pritchard v. Norton, supra.*

■ Defendants contend that, even assuming that the estate had a legally cognizable property right in its underlying claim against the Army Chemical Corps and federal officials for causing Blauer's wrongful death, their alleged conduct amounted only to an interference with the estate's remedy rather than with the property right itself, because the estate received $18,000 in compensation for Blauer's death. *Ex Parte Collett,* 337 U.S. 55, 71, 69 S.Ct. 959, 952, 93 L.Ed. 1207 (1949) (no property right established by remedial provision); *Gibbes, supra,* 290 U.S. at 332, 54 S.Ct. at 142; *Petersen v. United States,* 191 F.2d 154, 157 (9th Cir.), *cert. denied,* 342 U.S. 885, 72 S.Ct. 174, 96 L.Ed. 664 (1951); *Standard Oil of Cal. v. United States,* 107 F.2d 402, 418 (9th Cir.1939), *cert. denied,* 309 U.S.

---

**2.** The conduct would have been actionable under N.Y. Penal L. § 273, or as a fraud that extended "over and beyond" perjury. *Anchor Wire, supra,* 277 App.Div. at 729–30, 102 N.Y.

S.2d at 873. Here the perjury was offered to conceal the liability of the Army Chemical Corps and officials, which was not an issue in the Court of Claims suit.

654, 60 S.Ct. 469, 84 L.Ed. 1003 (1940). We disagree. The officials are alleged to have entirely concealed the fact that Blauer's rights were violated by the federal government and federal officials. Thus the alleged conduct wholly deprived the estate of its causes of action against federal defendants. This deprivation cannot be termed a mere alteration of remedies or forms of recovery, but rather rose to the level of infringement of the estate's underlying rights.

Similarly, we reject the argument that the alleged "cover-up" did not harm the estate. Although the settlement figure in the estate's New York Court of Claims suit was increased from $15,000 to $18,000 by the court after it had been advised *ex parte* by Marcus of the federal involvement, it is apparent that the estate would not have accepted $18,000 in settlement if it had known of that involvement but would have demanded a much higher figure, as defendant Leonard recognized in stating that if all of the circumstances were revealed "the case would be worth between $60,000 and $75,000." The difference between the true value of the estate's underlying claim and the settlement figure represented a property right, the secret denial or suppression of which by the federal-attorney defendants in conspiracy with New York State Assistant Attorney General Marcus would amount to a denial of the estate's constitutional right without due process of law.

Lastly, the federal appellants maintain that they are entitled to qualified immunity because their alleged conduct took place prior to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), which established a cause of action for damages predicated directly on violation of the United States Constitution. We do not read the requirements of *Harlow v. Fitzgerald, supra,* so strictly. Where plaintiffs allege the violation of a clearly established Constitutional norm, and that the offensive conduct gave rise to a remedy in damages, qualified immunity is not applicable. *Davis, supra,* 104 S.Ct. at 3020. In such a situation immunity is inappropriate because the officials could anticipate that their conduct posed the risk of liability in damages, albeit on a state tort law theory. The fact that the damage remedy was not based directly on the federal right asserted does not alter this conclusion.

For the foregoing reasons we affirm the district court's dismissal of the complaint against David Marcus on the ground that he is entitled to absolute immunity and its denial of the federal-attorney defendants' motion to dismiss or in the alternative for summary judgment on grounds of immunity. Our affirmance of the denial of the federal-attorney defendants' motion does not imply any view as to the merits of the estate's claims or of any other issues not raised on this appeal. We hold only that if the estate at trial should succeed in proving its allegations by a fair preponderance of the evidence the federal-attorney defendants would not be entitled to absolute or qualified immunity.[3]

CARDAMONE, Circuit Judge, concurring:

I concur in the result.

---

**3.** For instance, despite the estate's claim that the defendant Frederick C. Lough participated in the alleged conspiracy to induce Marcus to conceal the involvement of the Army Chemical Corps in the experimental injections of Blauer for chemical warfare research, the government contends that his sole activity consisted of his delivery of the Chemical Corps' $9,000 settlement check to the Army Judge Advocate General Corps in 1955 and that he did not participate in any of the 1954 meetings or discussions regarding Marcus' concealment of evidence from the estate or the transfer of documents from New York to Maryland. If so, the district court might well be justified in dismissing on the merits the estate's claim against him.