Sebastian **MANGIAFICO**, Plaintiff,

v.

Richard **BLUMENTHAL**, John Armstrong, and Teresa Lantz, Defendants.

No. 3:04CV74MRK.

United States District Court, D. Connecticut.

March 2, 2005.

Michelle N. Holmes, Sack, Spector & Karsten, West Hartford, CT, for Plaintiff.

Philip Miller, Susan Quinn Cobb, Attorney General's Office, Hartford, CT, for Defendants.

### MEMORANDUM OF DECISION

KRAVITZ, District Judge.

Plaintiff Sebastian Mangiafico, a Captain in the Connecticut Department of Corrections ("DOC"), brings this action pursuant to 42 U.S.C. §§ 1983 and 1988 against Defendants Richard Blumenthal, the Attorney General of the State of Connecticut, John Armstrong, a former DOC Commissioner, and Teresa Lantz, the current DOC Commissioner. As clarified by his counsel at oral argument, Captain Mangiafico makes two claims in his lawsuit, which seeks monetary and other relief against the defendants in their individual capacities. First, he asserts that he was denied equal protection of the laws when the Attorney General, in conspiracy with the other Defendants, decided that the State, through the Attorney General's Office, would not appear on Captain Mangiafico's behalf and represent him in a prisoner civil rights action currently pending in this District. Second, Captain Mangiafico claims that Commissioner Lantz violated his First Amendment rights by retaliating against him for bringing this lawsuit. See Am. Compl. [doc. # 9].

Currently pending before the Court is Defendants' Motion to Dismiss [doc. # 19]. The motion to dismiss requires this Court to decide the following issue of first impression within the Second Circuit and, so far as the Court is aware, elsewhere as well: Whether a state attorney general is entitled to absolute immunity from a § 1983 claim that is based upon the attor-

ney general's decision not to defend a state employee in a pending civil lawsuit involving the employee's conduct. The Court concludes that the Attorney General is entitled to absolute immunity on such a claim. Therefore, the Court ·dismisses Captain Mangiafico's § 1983 claim ·against the Attorney General. However, the Court denies Defendant Lantz's motion to dismiss the First Amendment retaliation claim asserted against her. Accordingly, Defendants' Motion to Dismiss [doc.· # 19] is GRANTED IN PART and DENIED IN PART.

## I.

The standard for assessing a motion to dismiss is familiar. On a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the *Federal Rules of Civil Procedure,* the Court should "construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true." *Todd v. Exxon Corp.,* 275 F.3d 191, 197 (2d Cir.2001). "A complaint should not be dismissed for failure to state a claim 'unless it appears beyond· doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* at 197–98 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Thus, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (internal quotation marks omitted).

■ In considering a motion to dismiss for failure to state a claim, a district court ordinarily must "limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference in the complaint." *Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999).

For purposes of Rule 12(b)(6) motions to dismiss,

the complaint is deemed to include any written instrument attached to it as·an exhibit ·or any statements or documents incorporated in· it by reference. Even where a document is not incorporated by reference, the court may nevertheless consider it where· the complaint relies heavily upon its terms and effect, which renders ·the document integral to the complaint.

*Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (internal citations and quotations omitted). Moreover, when considering a Rule 12(b)(6) motion, a court may also consider "matters of which judicial notice may be taken," *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993), so·long as the plaintiff relied on the terms and effect of such matters in drafting his complaint. "[T]he harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered. Accordingly, 'where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in· framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.'" *Chambers,* 282 F.3d at 153 (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991)) (internal citation omitted).

■ Here, the docket sheets in the prisoner civil rights action involving Captain Mangiafico are matters of which this Court may properly take judicial notice. *See Brass,* 987 F.2d at 150; *Hayden,* 180 F.3d at 54. Furthermore, ·Captain Mangiafico clearly incorporated pleadings from the prisoner civil rights action by reference in his complaint, and he relied on events in that action in drafting his complaint. *See, e.g.,* Compl. [doc. # 1], at ¶¶ 4–12; Am.

Compl. dated Feb. 17, 2004 [doc. # 9], at ¶¶ 5–6, 9–32; Am. Compl. dated Aug. 11, 2004 [doc. # 34], at ¶¶ 5–6, 9–33; *see also Chambers,* 282 F.3d at 153. Therefore, the Court will take judicial notice of the docket sheet and pleadings in the prisoner civil rights action that is the focus of Captain Mangiafico's claims, and the Court can do so without converting Defendant's motion to dismiss under Rule 12(b)(6) into a motion for summary judgment under Rule 56. *See Hayden,* 180 F.3d at 54.

## II.

On August 12, 1998, Captain Mangiafico was involved in the removal of an inmate, Duane Ziemba, from his jail cell at Connecticut's Northern Correctional Institution after Mr. Ziemba had set off the sprinkler in his cell and flooded it because correctional officers were allegedly refusing to feed him. As a result of the injuries Mr. Ziemba claims he sustained during the cell extraction, he filed a lawsuit, *Ziemba v. Armstrong,* No. 98cv2344 (JCH) (the "Ziemba Action"), in the United States District Court for the District of Connecticut. The current defendants in that action are Captain Mangiafico and a number of other DOC employees, including former DOC Commissioner Armstrong. In that lawsuit, Mr. Ziemba is seeking damages from the defendants in their individual capacities under § 1983 because they allegedly violated his constitutional rights by, among other things, using excessive force and failing to provide adequate health care. *See Ziemba v. Armstrong,* No. 98cv2344 (JCH), Am. Compl. [doc. # 238].[1]

The Connecticut General Assembly has enacted laws providing certain indemnification rights to state employees who are sued for acts committed while discharging their state duties. As is relevant to this case, § 5–141d(a) of the Connecticut General Statutes provides that the State "shall save harmless and indemnify" any state officer or employee from financial loss and expense arising out of:

> any claim, demand, suit or judgment by reason of his alleged negligence or alleged deprivation of any person's civil rights or other act or omission resulting in damage or injury, if the officer, employee or member is found to have been acting in the discharge of his duties or within the scope of his employment and such act or omission is found not to have been wanton, reckless or malicious.

Conn. Gen.Stat. § 5–141d(a). Section 5–141d(b) also provides that "[t]he state, through the Attorney General shall provide for the defense" of any state officer or employee in any civil action in state or federal court arising out of an act or omission occurring (or alleged to have occurred) while the officer or employee was discharging his duties or within the scope of his employment,

> except that the state shall not be required to provide for such a defense whenever the Attorney General, based on his investigation of the facts and circumstances of the case, determines that it would be inappropriate to do so, and he so notifies the officer, employee or member in writing.

Conn. Gen.Stat. § 5–141d(b). Finally, under § 5–141d(c), the State will pay for a state employee's personal legal fees and costs to defend his interests in such a civil action only where:

---

**1.** The facts underlying the incident involving Mr. Ziemba are hotly disputed, but they are immaterial for purposes of the pending motion to dismiss. For a more thorough discussion of the events surrounding the extraction of Mr. Ziemba from his cell, the Court refers readers to the recent decision of Judge Janet C. Hall in *Ziemba v. Armstrong,* 343 F.Supp.2d 173, 175–76 (D.Conn.2004).

(1) the Attorney General has stated in writing to the officer, employee or member, pursuant to subsection (b), that the state will not provide an attorney to defend the interests of the officer, employee or member, and (2) the officer, employee or member is thereafter found to have acted in the discharge of his duties or in the scope of his employment, and not to have acted wantonly, recklessly or maliciously. Such legal fees and costs incurred by a state office or employee shall be paid to the officer or employee only after the final disposition of the suit, claim or demand and only in such amounts as shall be determined by the Attorney General to be reasonable.

Conn. Gen.Stat. § 5–141d(c).

The procedural history of the Ziemba Action is somewhat complex due in part to the fact that Mr. Ziemba, acting *pro se*, filed a number of complaints and apparently did not properly and timely serve certain defendants, including Captain Mangiafico. Am. Compl. [doc. # 34], at ¶ 26. However, as suggested by counsel at oral argument and as is confirmed by the docket sheet for the Ziemba Action, it appears that at some point during the pendency of the Ziemba Action, an attorney from the Attorney General's Office filed an appearance on behalf of all of the defendants, including Captain Mangiafico. *See Ziemba v. Armstrong*, No. 98cv2344 (JCH), Appearance [doc. # 111]. Then, in or about January 2001, the Attorney General's Office informed Captain Mangiafico by letter that, having investigated allegations that Captain Mangiafico had used excessive force by intentionally punching Mr. Ziemba in the face, the Attorney General had decided under § 5–141d(b) of the Connecticut General Statutes not to provide Captain Mangiafico with representation in the Ziemba Action. *See* Letter to Captain Mangiafico dated January 12, 2001, attached to Defs.' Mot. to Dismiss [doc. # 19]. The letter also informed Captain Mangiafico that he should immediately arrange to retain private counsel to represent him at his own expense and that if, at the conclusion of the lawsuit, he was found to have acted in discharge of his duties and not have acted wantonly, recklessly or maliciously, he would be entitled to "reimbursement for any legal fees and costs [he] may incur in this matter, but only in such amounts as shall be determined by the Attorney General to be reasonable." *Id.*

Thereafter, the attorney from the Attorney General's Office who had appeared on Captain Mangiafico's behalf in the Ziemba Action moved to withdraw his appearance on behalf of Captain Mangiafico, and the District Court granted that motion. *See Ziemba v. Armstrong*, No. 98cv2344 (JCH), Ruling Granting Motion to Withdraw [doc. # 157]. Since then, private counsel has appeared in the Ziemba Action for Captain Mangiafico and continues to represent him in that action, while the Attorney General's Office, on behalf of the State, has continued to represent the other DOC employees who are defendants. *See* Compl. [doc. # 1], at ¶¶ 11–12.[2]

On January 16, 2004, Captain Mangiafico filed this lawsuit, alleging that the Attorney General's decision not to appear on behalf of Captain Mangiafico and represent him in the Ziemba Action violated his equal protection rights by "singl[ing] the plaintiff out as a scapegoat and con-

---

**2.** The Ziemba Action has been pending for some years now. Most recently, the District Court denied motions for summary judgment on behalf of most of the defendants. *See Ziemba*, 343 F.Supp.2d at 186. However, trial of the case will be delayed because the defendants have recently appealed the District Court's decision to the Second Circuit. *See Ziemba v. Armstrong*, No. 98cv2344 (JCH), Notice of Appeal [doc. # 299].

tinu[ing] to do so by refusing to provide him with representation and instead holding him solely responsible for the incident [involving Ziemba]." Compl. [doc. # 1], at ¶ 12. The Attorney General was the only defendant in the original complaint.

A month later, Captain Mangiafico amended his complaint to allege claims against the former and present Commissioners of DOC, John Armstrong and Teresa Lantz, respectively. Am. Compl. dated Feb. 17, 2004 [doc. # 9], at 1 (preliminary statement). In his Amended Complaint, Captain Mangiafico alleges that Commissioners Armstrong and Lantz conspired with the Attorney General to violate his equal protection rights by denying him representation in the Ziemba Action. Am. Compl. dated Aug. 11, 2004 [doc. # 34] at ¶¶ 5 & 28.[3] More specifically, Captain Mangiafico claims that the Defendants decided to make him the "scapegoat" for the Ziemba Action, *id.* at ¶¶ 21 & 28, by denying him legal representation that the State routinely provides other state employees in similar situations and then blaming Captain Mangiafico for whatever misconduct occurred in connection with Mr. Ziemba's cell extraction. *Id.* at ¶¶ 18, 20–22, 24, 27–28, 30, 33. Captain Mangiafico also asserts that Commissioner Lantz violated his First Amendment rights by transferring him to another DOC facility allegedly in retaliation for filing this lawsuit. *Id.* at ¶¶ 34, 35–38.[4] The Amended Complaint seeks damages from each defendant in their individual capacities. *Id.* at ¶¶ 2–4.[5]

### III.

Attorney General Blumenthal argues that he is entitled to absolute immunity for any claims based on his decision that the State, through his Office, would not represent Captain Mangiafico in the Ziemba Action. The propriety of applying the doctrine of absolute immunity to the Attorney General's decision not to defend Captain Mangiafico, a state employee, in a pending civil action is, so far as the Court and parties are aware, a matter of first impression.

The Court notes that *Flanagan v. Blumenthal*, No. 03:98CV148 (CFD) (D.Conn. Nov. 22, 1999) (unpublished), *aff'd on other grounds*, 229 F.3d 1135, 2000 WL 1508874 (2d Cir. Oct 12, 2000) (unpublished), did involve a due process claim related to the Attorney General's decision not to defend a state employee in a civil action. However, in *Flanagan*, neither the District Court nor the Second Circuit addressed the issue of the Attorney General's entitlement to absolute immunity, and it appears that the issue of absolute immunity was never raised in that litigation. The Court also is aware that the Seventh Circuit has held that "when reviewing proposed contracts for the state, the Indiana Attorney General is performing a quasi-judicial function and his conduct thereunder is entitled to absolute immunity from prosecution for damages under Section 1983." *Mother Goose Nursery Schools v. Sendak*, 770 F.2d 668, 675 (7th Cir.1985). However, *Mother Goose* did not involve an attorney general's decision not to defend a state employee in

---

**3.** The Court notes that the paragraphs are mis-numbered in Plaintiff's Amended Complaint dated August 11, 2004 [doc. # 34], and the Court's citation refers to the first occurrence of paragraph five, found on page three of the Amended Complaint.

**4.** The Court's citation refers to the second occurrence of paragraphs thirty-five through thirty-eight, found on page fourteen of the Amended Complaint. *See* note 3 *supra.*

**5.** The Court's citation refers to the first occurrence of paragraphs two through four, found on pages two and three of the Amended Complaint. *See* note 3 *supra.*

a civil action. Furthermore, its premise and holding have been expressly rejected by the Second Circuit. *See Blouin ex rel. Estate of Pouliot v. Spitzer,* 356 F.3d 348, 356 n. 8 (2d. Cir.2004). Therefore, there is no precedent directly addressing the issue presented by this case, although there is considerable case law in the Supreme Court and Second Circuit discussing the scope of immunity available to government attorneys who are sued in § 1983 actions.

## A.

Though § 1983 is broadly worded, the Supreme Court "has consistently recognized" that it "was not meant to abolish wholesale all common-law immunities.'" *Burns v. Reed,* 500 U.S. 478, 484, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (quoting *Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)). Instead, the Supreme Court has held that § 1983 must be "read in harmony with general principles of tort immunities and defenses," and the Court has recognized that for some "special functions," *Butz v. Economou,* 438 U.S. 478, 508, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), "it is better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Imbler v. Pachtman,* 424 U.S. 409, 428, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (internal quotation and citations omitted).

■■ That said, it is the "official seeking absolute immunity [who] bears the burden of showing that it is warranted for the function in question, against a presumption that qualified immunity affords sufficient protection." *Blouin,* 356 F.3d at 357 (citing *Burns,* 500 U.S. at 486–87, 111 S.Ct. 1934). Moreover, the Court is well aware that the Supreme Court "has refused to extend absolute immunity beyond a very limited class of officials ... 'whose

special functions or constitutional status requires complete protection from suit.'" *Hafer v. Melo,* 502 U.S. 21, 29, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The reason why courts have granted absolute immunity "quite sparingly," *Forrester v. White,* 484 U.S. 219, 224, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988), is quite simple. Courts do not have "license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy," *Tower v. Glover,* 467 U.S. 914, 922, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984), and "[in] most cases, qualified immunity is sufficient to 'protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.'" *Buckley v. Fitzsimmons,* 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (quoting *Butz,* 438 U.S. at 506, 98 S.Ct. 2894).

Cognizant, therefore, of the fact that "[a]bsolute immunity is of a 'rare and exceptional character,'" *Barrett v. United States,* 798 F.2d 565, 571 (2d Cir.1986) (quoting *Cleavinger v. Saxner,* 474 U.S. 193, 202, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985)), the Court will review the development of the absolute immunity doctrine as applied to government attorneys to determine whether that doctrine should include the Attorney General's decision, on behalf of the State, not appear on behalf of and defend Captain Mangiafico in the Ziemba Action.

## B.

Because of the special functions they perform and the role they serve in the judicial process, government attorneys have been granted absolute immunity in certain limited circumstances. The Supreme Court jurisprudence on the absolute

immunity of government attorneys initially developed in the criminal context. In its landmark decision in *Imbler v. Pachtman, supra*, the Supreme Court affirmed and clarified a number of circuit court decisions that had relied on a variety of grounds to grant state prosecutors absolute immunity from suit under § 1983. *See, e.g., Fanale v. Sheehy*, 385 F.2d 866, 868 (2d Cir.1967) ("immunity rule is designed to promote principled and fearless decision-making" and district attorney is entitled to same immunity from suits under § 1983 as a justice of the peace) (quotations omitted); *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949) (Hand, J.) ("[T]o submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties."). *Cf. Yaselli v. Goff*, 12 F.2d 396, 404, 406 (2d Cir.1926) (United States Attorney is a "quasi judicial officer," who, "in the performance of the duties imposed upon him by law, is immune from a civil action for malicious prosecution. . . . The immunity is absolute, and is grounded on principles of public policy.").

*Imbler* involved a prosecutor who was sued under § 1983 by a former defendant in a criminal action because the prosecutor allegedly had procured and knowingly used perjured testimony in that criminal action. Examining the common law and historical roots of immunity for prosecutors and the public policy concerns raised by the specter of disgruntled litigants suing prosecutors, the Supreme Court held that a prosecutor's decision to initiate a criminal prosecution is entitled to absolute immunity from a civil suit for damages under § 1983. *See Imbler*, 424 U.S. at 422–28, 96 S.Ct. 984. In the Supreme Court's view, anything less than absolute immunity risked "harassment by unfounded litigation [that] would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.* at 423, 96 S.Ct. 984. As the Court stated:

[t]he public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages. Such suits could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate. Further, if a prosecutor could be made to answer in court each time such a person charged him with wrongdoing, his energy and attention would be diverted from the pressing duty of enforcing the criminal law.

*Id.* at 424–25, 96 S.Ct. 984.

"Delineating the boundaries of [its] holding," *Imbler* stated that a prosecutor is entitled to absolute immunity when he acts as an "advocate" for the government in activities that are "intimately associated with the judicial phase of the criminal process." *Id.* at 430–31, 96 S.Ct. 984; *see also Parkinson v. Cozzolino*, 238 F.3d 145, 150 (2d Cir.2001) ("It is well-settled that prosecutors sued under 42 U.S.C. § 1983 are entitled to absolute immunity from claims for damages arising out of prosecutorial duties that are intimately associated with the judicial phase of the criminal process.") (internal quotations omitted) (citing *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir.1996); *Imbler*, 424 U.S. at 430, 96 S.Ct. 984). However, in a much-cited footnote, the Supreme Court also recognized that

the duties of the prosecutor in his role as advocate for the State involve actions

preliminary to the initiation of a prosecution and actions apart from the courtroom. A prosecuting attorney is required constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues. These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court.

*Imbler,* 424 U.S. at 431 n. 33, 96 S.Ct. 984.

*Imbler,* therefore, established the two extremes of a government attorney's basic functions—that of an advocate and that of an administrator. When functioning as an advocate of the government in activities intimately associated with the judicial process, a government attorney receives absolute immunity; when functioning as an administrator, a government attorney receives only qualified immunity. "Drawing a proper line between these functions" was expressly left to future cases. *Id.; see also Cleavinger,* 474 U.S. at 206, 106 S.Ct. 496 ("the line between absolute immunity and qualified immunity often is not an easy one to perceive and structure.").

Shortly after *Imbler,* in *Butz v. Economou, supra,* the Supreme Court held that the absolute immunity *Imbler* had accorded to criminal prosecutors in judicial proceedings should also apply to government officials and administrative agency attorneys playing similar roles in administrative proceedings. As the Court observed in *Butz,* "[w]e think that adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages." *Butz,* 438 U.S. at 512–13, 98 S.Ct. 2894. The Supreme Court looked by analogy to the functions performed by a criminal prosecutor as outlined in *Imbler.* Regarding the initiation of administrative proceedings, the Supreme Court noted as follows:

> The decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution. An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought.... The discretion which executive officials exercise with respect to the initiation of administrative proceedings might be distorted if their immunity from damages arising from that decision was less than complete.

*Id.* at 515, 98 S.Ct. 2894. Commenting on the conduct of the administrative proceeding itself—such as introducing evidence and cross-examining witnesses—the Court stated:

> We can see no substantial difference between the function of the agency attorney in presenting evidence in an agency hearing and the function of the prosecutor who brings evidence before a court. In either case, the evidence will be subject to attack through cross-examination, rebuttal, or reinterpretation by opposing counsel. Evidence which is false or unpersuasive should be rejected upon analysis by an impartial trier of fact. If agency attorneys were held personally liable in damages as guarantors of the quality of their evidence, they

might hesitate to bring forward some witnesses or documents.

*Id.* at 516–17, 98 S.Ct. 2894 (footnote omitted). By comparing the function of the agency attorneys and other administrative officials to the historic and common law immunities granted to criminal prosecutors as applied by *Imbler* to suits under § 1983, the Supreme Court held that government attorneys initiating administrative proceedings were entitled to absolute immune from liability for damages from their actions.

In several decisions following *Imbler* and *Butz*, the Supreme Court had occasion to elaborate on the factors that determine where courts should draw the line between advocacy for the government, on the one hand, and investigative or administrative functions, on the other. In *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court faced the question whether the nation's chief law enforcement official—the Attorney General—was absolutely immune from claims arising from his decision to wiretap individuals as a part of the exercise of his national security functions. *Id.* at 513–14, 105 S.Ct. 2806. The Supreme Court concluded that he was not. Noting that (1) there was no historical or common law immunity for a government attorney's national security functions, *id.* at 521, 105 S.Ct. 2806, (2) the conduct involved was not prosecutorial in nature and was divorced from the judicial process—the "primary wellspring[ ]" of absolute immunity, *id.*, and (3) there were no alternative restraints on the Attorney General's activities in the name of national security, *id.* at 522–23, 105 S.Ct. 2806, the Supreme Court held that the Attorney General was entitled only to qualified immunity for the exercise of his national security functions. *Id.* at 524, 105 S.Ct. 2806.

Six years later in *Burns v. Reed, supra,* the Supreme Court again revisited the line between those functions that require absolute immunity and those that do not. In *Burns,* the Court held that a prosecutor was absolutely immune from § 1983 liability for knowingly using misleading testimony during a probable cause hearing, but he was not entitled to absolute immunity for giving erroneous advice to the police that there was probable cause to arrest a suspect and that the suspect could be questioned under hypnosis. *Burns,* 500 U.S. at 492, 496, 111 S.Ct. 1934. In the Supreme Court's view, the prosecutor's actions in "appearing before a judge and presenting evidence in support of a motion for a search warrant" were done in his role as an " 'advocate for the State,' rather than [in] his role as [an] 'administrator or investigative officer.' " *Id.* at 491–92, 111 S.Ct. 1934 (quoting *Imbler,* 424 U.S. at 430–31, 96 S.Ct. 984). Appearing at the probable cause hearing was "intimately associated with the judicial phase of the criminal process," *Imbler,* 424 U.S. at 430, 96 S.Ct. 984, and thus it was "connected with the initiation and conduct of the prosecution." *Burns,* 500 U.S. at 492, 111 S.Ct. 1934.

By contrast, the Court found no historical or common law support for extending absolute immunity to the prosecutor's actions in providing legal advice to the police. Nor did the Court find any significant risk of burdensome litigation in providing the prosecutor with only qualified immunity for such functions. *Id.* at 493–94, 111 S.Ct. 1934. As the Court noted, "the concern with litigation in our immunity cases is not merely a generalized concern with interference with an official's duties, but rather is a concern with interference with the conduct closely related to the judicial process." *Id.* at 494, 111 S.Ct. 1934. "Absolute immunity is designed to free the *judicial process* from the harassment and intimidation associated with litigations."

*Id.* (emphasis in original). That concern warranted absolute immunity only for actions by the prosecutor "that are connected with the prosecutor's role in judicial proceedings, not every litigation-inducing conduct." *Id.*

Two terms later, the Court considered whether a prosecutor was entitled to absolute immunity when he was sued under § 1983 for retaining a pliable expert to fabricate evidence during an investigation for the purposes of obtaining an indictment, and also for making false statements to the press at the public announcement of the indictment. In *Buckley v. Fitzsimmons, supra,* the Supreme Court held that neither function warranted absolute immunity. The Court held that when a prosecutor performs investigative functions normally performed by a detective or police officer that do not relate to an advocate's preparation for initiation of a prosecution or judicial proceedings, the prosecutor is not entitled to absolute immunity.. *Buckley,* 509 U.S. at 274, 113 S.Ct. 2606. However, the Court reiterated that the duties of a prosecutor in his role as advocate often involve " 'actions preliminary to the initiation of the prosecution and actions apart from the courtroom,' " and that those functions are "nonetheless entitled to absolute immunity." *Id.* at 272–73, 113 S.Ct. 2606 (quoting *Imbler,* 424 U.S. at 431 n. 33, 96 S.Ct. 984). Indeed, the Court emphasized that it was "not retreat[ing] ... from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as advocate for the State, are entitled to the protections of absolute immunity." *Buckley,* 509 U.S. at 273, 113 S.Ct. 2606.

Most recently, in *Kalina v. Fletcher,* 522 U.S. 118, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997), the Supreme Court considered whether a prosecutor was entitled to absolute immunity when sued under § 1983 for preparing an arrest warrant application that was based, in part, on false statements. The prosecutor's application contained three documents: (1) an unsworn information; (2) an unsworn motion for an arrest warrant; and (3) a sworn "Certification for Determination of Probable Cause" that summarized the evidence supporting the charge, yet contained two inaccurate factual statements. *Id.* at 118–21, 118 S.Ct. 502. Looking to its earlier cases for guidance, the Supreme Court concluded that preparation of the first two documents—the information and the arrest warrant—was entitled to absolute immunity because preparation of those documents fell squarely within the prosecutor's traditional role as an advocate. *Id.* at 129, 118 S.Ct. 502.

The Court also acknowledged "that the *preparation* and *filing* of the third document ... was part of the advocate's function." *Id.* (emphasis added). Specifically, the prosecutor functioned as an advocate of the state during her

> drafting of the certification, her determination that the evidence was sufficiently strong to justify a probable-cause finding, her decision to file charges, ... her presentation of the information and the motion to the court.... [and] even [her] selection of the particular facts to include in the certification to provide the evidentiary support for the finding of probable cause.

*Id.* at 130, 118 S.Ct. 502. However, the Court noted, "[t]estifying about facts is the function of the witness, not of the lawyer.... Even when the person who makes the constitutionally required 'Oath or affirmation' is a lawyer, the only function that she performs in giving sworn testimony is that of a witness." *Id.* at 130–31, 118 S.Ct. 502. And when functioning as a witness in such circumstances, prosecutors are not

entitled to absolute immunity because complaining witnesses "were not absolutely immune at common law." *Id.* at 127 n. 14, 118 S.Ct. 502 (quoting *Malley v. Briggs*, 475 U.S. 335, 340–341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). In so holding, the Supreme Court once again made clear that it was not departing from its prior cases "that have recognized that the prosecutor is fully protected by absolute immunity when performing the *traditional functions of an advocate.*" *Kalina*, 522 U.S. at 127, 118 S.Ct. 502 (emphasis added) (citing *Imbler*, 424 U.S. at 431, 96 S.Ct. 984; *Buckley*, 509 U.S. at 273, 113 S.Ct. 2606).

## C.

The Second Circuit has extended *Imbler* beyond a prosecutor's decision to bring criminal charges against a defendant. For example, in a mirror image to the factual setting of *Imbler*, the Second Circuit in *Schloss v. Bouse*, 876 F.2d 287 (2d Cir. 1989), held that a prosecutor's decision *not to* initiate a criminal prosecution was as protected by absolute immunity as his decision *to* prosecute. The court reasoned as follows:

> We think that, as a matter of logic, absolute immunity must also protect the prosecutor from damages suits based on his decision not to prosecute.... [A]bsolute protection from a damages suit for not prosecuting is warranted simply because the decision with respect to any given charge is an either-or proposition. A decision to prosecute logically eliminates the nonprosecution option, and vice versa. If the prosecutor had absolute immunity only for the decision to prosecute and not for a decision not to prosecute, his judgment could be influenced in favor of a prosecution that sound and impersonal judgment would eschew. Thus, the contours of absolute prosecutorial immunity should be drawn

to avoid skewing the prosecutor's judgment in either direction, both to eliminate the appearance that personal considerations may be a factor, and to avoid establishing a doctrine that would discourage prosecutors from dismissing meritless actions before trial, since only by pursuing charges would the prosecutor be fully immune.

*Id.* at 290.

Relying on *Butz, supra,* the Second Circuit has also extended absolute immunity principles beyond the criminal context to the civil setting. In *Barrett v. United States, supra,* state and federal government attorneys were sued under § 1983 for their actions in covering up and concealing information about the United States Army's role in the death of an individual whose estate had brought a wrongful death action against the state. *Barrett,* 798 F.2d at 570. According to *Barrett,* the same principles governing absolute immunity in the initiation of criminal prosecutions and administrative proceedings "should a *fortiori* govern the government attorney's initiation of civil litigation in a state or federal court." *Id.* at 572; *see also Spear v. Town of West Hartford,* 954 F.2d 63, 66 (2d Cir.1992) ("government attorneys who initiate civil suits" are entitled to absolute immunity). *Barrett* also stated, in a holding that has particular relevance to this case, that *Imbler's* principles required absolute immunity for lawyers in the state attorney general's office in connection with their conduct in representing the state in the *defense* of the wrongful death action:

> Although government defense counsel, not having selected the other party as the target of the litigation, is in a more passive position than a prosecutor or plaintiff's representative, he nevertheless functions in an adversarial arena where "there is, if not always a winner,

at least one-oser," and since he is charged with a public trust he should not be inhibited in the faithful performance of his duties by the threat of harassing lawsuits against him. His function as a government advocate therefore entitles him to absolute immunity, which is "necessary to assure that ... advocates ... can perform their respective functions without harassment or intimidation."

*Barrett,* 798 F.2d at 572 (quoting *Butz,* 438 U.S. at 512, 98 S.Ct. 2894); *see also Dacey v. Dorsey,* 568 F.2d 275, 278 (2d Cir.1978) (United States Attorney who received a formal complaint from plaintiff, and chose not to seek an injunction to restrain alleged civil rights violation, was absolutely immune from damages suit).

*Barrett* further explained that absolute immunity for government attorneys "encompasses not only their conduct of trials but also all of their activities that can be fairly characterized as closely associated with the conduct of litigation or potential litigation." *Barrett,* 798 F.2d at 571–72. However, that principle did not cloak federal attorneys with absolute immunity for their conduct in trying to prevent the federal government's exposure to liability. Because the United States had never been named as a party in the state wrongful death action, the federal attorneys had not acted as counsel for any of the parties in the wrongful death action. Instead, their efforts were "devoted mainly to avoiding involvement of the federal government of federal officials in such proceedings by keeping the estate ignorant of the role played by the United States Government," functions that did not warrant absolute immunity. *Id.*

More recently in *Blouin ex rel. Estate of Pouliot v. Spitzer, supra,* the Second Circuit addressed the question whether the New York Attorney General, and an attorney in his office, were entitled to absolute immunity for their conduct in advising a state hospital to continue hydration and nutrition for a terminally ill patient and in obtaining an appointment of a guardian for the patient from a probate court. *Blouin,* 356 F.3d at 354–56. The court found neither common law nor historical support for the state attorneys' claim of absolute immunity for such functions. In particular, the court held that in providing advice to the hospital, the government attorneys were not acting as advocates for the state in an adversarial proceeding, they were not acting as prosecutors, and they were not intimately associated with the judicial phase of any action. *Id.* at 357. Even when seeking and obtaining the appointment of a guardian of the terminally ill patient in probate court—a judicial proceeding where the state attorneys were arguably acting as advocates—the Second Circuit made a key distinction, stating that "[i]n seeking the appointment of a guardian for [a patient], their principal objective was the protection of her well-being. While the public had an undeniable interest in her treatment, [the patient's] interests were the paramount ones, and the state's were derivative." *Id.* at 358.

### D.

Certain principles are apparent from the foregoing review of Supreme Court and Second Circuit case law: Government attorneys are entitled to absolute immunity when they function within the confines of their role as advocates of the government in activities or functions that are intimately or integrally associated with the judicial (or administrative) process. *See, e.g., Buckley,* 509 U.S. at 273, 113 S.Ct. 2606; *Barrett,* 798 F.2d at 572. When government attorneys act beyond the scope of their traditional role as advocates of the government and engage in

activities that are properly seen as "administrative or investigative in nature," they are entitled only to qualified immunity. *Lawson v. Abrams*, 863 F.2d 260, 263 (2d Cir.1988).[6]

An intimate association with the judicial process is important for three reasons. First, as *Imbler* makes clear, a nexus to the initiation or conduct of a judicial proceeding provides the historical, common law basis needed to support a claim of absolute immunity. *See Imbler*, 424 U.S. at 422–28, 96 S.Ct. 984; *see also Mitchell v. Fishbein*, 377 F.3d 157, 174 (2d Cir. 2004) (a judge or other judicial official is entitled to absolute immunity for actions " 'integrally related' to a judicial proceeding' " when that official is "engaged in acts that are integrally related not simply to the judicial process in general but to a concrete judicial case or controversy."). Second, the closer an attorney's activities are to an ongoing judicial proceeding, the more likely it is that the attorney is functioning as an advocate of the government (as opposed to some other role). Finally, the more closely tied an attorney's conduct is to a judicial proceeding, the more essential it is to safeguard the integrity of the judicial process itself through the grant of absolute immunity. As the Supreme Court explained in *Kalina*, the "absolute

immunity that protects the prosecutor's role as an advocate is not grounded in any special 'esteem for those who perform these functions, and certainly not from a desire to shield abuses of office, but because any lesser degree of immunity could *impair the judicial process itself.*' " *Kalina*, 522 U.S. at 127, 118 S.Ct. 502 (emphasis added) (quoting *Malley*, 475 U.S. at 342, 106 S.Ct. 1092); *see, e.g., Pinaud v. County of Suffolk*, 52 F.3d 1139, 1148 (2d Cir.1995) ("absolute immunity will generally cover a prosecutor for all actions taken in court").

■ That said, *Kalina* and *Blouin* make clear that a connection with an ongoing judicial proceeding is not invariably determinative of an attorney's status as government advocate. *See Kalina*, 522 U.S. at 127–31, 118 S.Ct. 502; *Blouin*, 356 F.3d at 354–56. And as *Buckley* and *Barrett* underscore, absolute immunity protects even out-of-court activities of a government attorney, so long as the activities are at least closely associated with the judicial process and a concrete case or controversy. *See Buckley*, 509 U.S. at 273, 113 S.Ct. 2606 ("preparing for the initiation of *judicial proceedings* or for *trial* " entitled to absolute immunity) (emphasis added); *Burns*, 500 U.S. at 492, 111 S.Ct. 1934 ("initiation

6. In *Taylor v. Kavanagh*, 640 F.2d 450 (2d Cir.1981), the Second Circuit specifically delineated a number of government attorney functions and activities that are "independent of prosecution" and thus outside the attorney's traditional role as an advocate of the government:

> [O]nly a "good faith" immunity is available where a prosecutor testifies falsely as a witness, distributes extraneous statements to the press designed to harm a suspect's reputation, or participates in an illegal search that violates a suspect's Fourth Amendment rights. Decisions to engage in conduct of this character are not directly related to the delicate judgments prosecutors must make concerning

the development of the Government's case. The "investigatory" and "administrative" work involved in testifying before a grand jury, accumulating evidence, and disseminating information to the press is analogous to the tasks performed by the police, and therefore only the same qualified "good faith" immunity is available.

*Id.* at 452–53 (citations omitted); *see also Lee v. Willins*, 617 F.2d 320, 322 (2d Cir.1980) ("[A] prosecutor is immune from a suit to recover for an injury arising solely from the prosecution itself ... [w]here the alleged harm is inflicted independently of the prosecution, however, absolute immunity will not attach.") (citing *Imbler*, 424 U.S. at 409, 96 S.Ct. 984).

and conduct of the *prosecution*" entitled to absolute immunity) (emphasis added); *Imbler,* 424 U.S. at 430, 96 S.Ct. 984 ("initiating a *prosecution* and ... presenting the State's *case*" entitled to absolute immunity) (emphasis added); *Barrett,* 798 F.2d at 571–72 ("The absolute immunity accorded to government prosecutors encompasses not only their *conduct of trials* but all of their activities that can fairly be characterized as closely associated with the *conduct of litigation or potential litigation.*") (emphasis added). *See also Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir.1994) ("The application of immunity is not limited to the duties a prosecutor performs in the courtroom.").

■ When, as here, a court is asked to accord absolute immunity to a government attorney's function or actions, the Supreme Court and Second Circuit instruct the court to consider whether three factors support or undermine the grant of absolute immunity for that particular function or action. These three factors are:

(1) whether a historical or common law basis exists for immunity from suit arising out of the performance of the function, (2) whether performance of the function poses obvious risks of harassing or vexatious litigation against the official, and (3) whether there exist alternatives to damage suits against the official as a means of redressing wrongful conduct.

*Barrett,* 798 F.2d at 571 (citing *Forsyth,* 472 U.S. at 521–23, 105 S.Ct. 2806). In sum, the case law teaches that a grant of absolute immunity to a government attorney for a particular function or action must be firmly grounded in history or the common law, must be employed sparingly to address only the most serious risks to the government attorney and the judicial process, and must be granted, if at all possible, only when other means of redress for

legitimate grievances are available. With the foregoing principles in mind, the Court will now turn to the specific facts of this case.

### IV.

#### A.

■ Turning first to the question of "whether there is historical or common-law support for cloaking the challenged actions with absolute immunity," *Blouin,* 356 F.3d at 358, the Court notes at the outset that there is neither direct historical evidence nor cases involving the immunity of a government attorney in deciding whether to represent a state employee in civil litigation.

However, as the Supreme Court did in *Butz,* this Court may look by analogy to the historic or common law immunity granted to other figures within the judicial process—such as judges or criminal prosecutors. *See Butz,* 438 U.S. at 512–17, 98 S.Ct. 2894 (describing the historical and common law roots of absolute immunity for judges and criminal prosecutors); *Barrett,* 798 F.2d at 572–73 (finding historical and common law support for absolute immunity of defending government litigators by looking to the "broader principle[s]" of absolute immunity afforded to judges and criminal prosecutors). As the Supreme Court observed in *Imbler,* the historical and common law immunity of criminal prosecutors

is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties. These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of

exercising the independence of judgment required by his public trust.

*Imbler*, 424 U.S. at 422–23, 96 S.Ct. 984 (footnote omitted); *see also Schloss*, 876 F.2d at 290 ("Though not all of the concerns discussed in *Imbler* indicate a need for absolute immunity with respect to a decision *not to prosecute*, many of the same factors may come into play.") (emphasis added). Ultimately, as the Supreme Court noted in *Buckley*, "[i]n determining whether particular actions of government officials fit within a common-law tradition of absolute immunity, or only the more general standard of qualified immunity, [courts] appl[y] a 'functional approach,' which looks to 'the nature of the function performed, not the identity of the actor who performed it.'" *Buckley*, 509 U.S. at 269, 113 S.Ct. 2606 (internal citations omitted) (quoting *Burns*, 500 U.S. at 486, 111 S.Ct. 1934; *Forrester v. White*, 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988)).[7]

In deciding whether the Attorney General's Office will—on behalf of the State— make an appearance for and defend a state employee in civil litigation involving the employee's state duties, the Attorney General is acting in his traditional role as the State's advocate. Courts have consistently afforded absolute immunity to a government attorney's decision whether or not to initiate a criminal or civil litigation, and therefore, whether the state's considerable resources and energy will be directed towards the *prosecution* of a particular case or controversy. *See, e.g., Buckley*, 509

U.S. at 273, 113 S.Ct. 2606; *Burns*, 500 U.S. at 492, 111 S.Ct. 1934; *Imbler*, 424 U.S. at 430, 96 S.Ct. 984; *Barrett*, 798 F.2d at 571–72. The Attorney General's decision is this case is analogous to those cases, for he was required by statute to determine whether the State's resources and prestige would be deployed in a pending judicial action to defend Captain Mangiafico. Insofar as the application of absolute immunity is concerned, the Court sees no meaningful difference between the Attorney General's decision in this case and the decisions of prosecutors and government attorneys to initiate (or not to initiate) criminal, civil or administrative proceedings.

Also, the Attorney General's decision not to defend Captain Mangiafico was intimately and integrally connected to a pending judicial action. *See, e.g., Buckley*, 509 U.S. at 273, 113 S.Ct. 2606; *Burns*, 500 U.S. at 492, 111 S.Ct. 1934; *Imbler*, 424 U.S. at 430, 96 S.Ct. 984; *Barrett*, 798 F.2d at 571–72. By definition, the Attorney General's decision whether to defend a state employee under § 5–141d(b) would ordinarily always be made in the context of a pending or threatened legal proceeding, and therefore, is akin to those " 'actions preliminary to the initiation of a prosecution and actions apart from the courtroom' that are nonetheless entitled to absolute immunity." *Buckley*, 509 U.S. at 272, 113 S.Ct. 2606 (quoting *Imbler*, 424 U.S. at 431, n. 33, 96 S.Ct. 984); *Dory*, 25 F.3d at 83 (2d Cir.1994) ("The application of immunity is not limited to the duties a prosecu-

---

**7.** Not only is the identity of the actor immaterial, but when absolute immunity is deemed appropriate for a given function or action, the motivation of the government attorney is of no consequence. *See, e.g., Bernard v. County of Suffolk*, 356 F.3d 495, 504 (2d Cir.2004) ("[T]he fact that improper motives may influence [the prosecutor's] authorized discretion cannot deprive him of absolute immunity.");

*see also Phillips*, 81 F.3d at 1210 (If "an act [is] within a prosecutor's jurisdiction as a judicial officer ... absolute immunity attache[s] to his actions, regardless of his motivation."); *Dory*, 25 F.3d at 83 ("[A]bsolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate.").

tor performs in the courtroom."). In fact, in this case, the Attorney General made a decision to withdraw the appearance that a lawyer from his Office had previously filed on Captain Mangiafico's behalf in the Ziemba Action. Therefore, the Attorney General sought and obtained the District Court's permission to withdraw that appearance.

Captain Mangiafico argues that in making the decision not to defend him, the Attorney General is acting merely as an administrator of the state statute governing indemnification and, in effect, merely "investigates" claims for representation that are made under the statute. The Court disagrees. The statute does require the Attorney General to conduct an investigation of the merits of a particular state employee's case before entering an appearance on his or her behalf, *see* Conn. Gen.Stat. § 5–141d(b), and *Buckley* and the other cases cited above do hold that not all investigatory functions are entitled to absolute immunity. *See, e.g., Buckley*, 509 U.S. at 273, 113 S.Ct. 2606; *Taylor*, 640 F.2d at 453. However, Captain Mangiafico is not suing the Attorney General over the conduct of his investigation. Nor is Captain Mangiafico complaining in this action about the Attorney General's possible future decision on whether to reimburse Captain Mangiafico for his legal expenses under § 5–141d(c) if Captain Mangiafico is ultimately successful in his own defense of the Ziemba Action. Those functions of the Attorney General may well be properly viewed as administrative or investigatory in nature and therefore may only be entitled to qualified immunity.

What *this* case is about and what Captain Mangiafico *is* challenging is the Attorney General's decision that the State, through his Office, would no longer represent Captain Mangiafico in the Ziemba

Action. That exercise of the Attorney General's professional judgment was done neither as an investigator nor administrator, but rather as an advocate of the State. *See, e.g., Kalina*, 522 U.S. at 129–30, 118 S.Ct. 502. It was also done in the context of, and integrally associated with, an ongoing judicial proceeding. As such, the Attorney General's function fits comfortably within those functions that the Supreme Court and Second Circuit recognize have historically been shielded by absolute immunity. *See, e.g., Buckley*, 509 U.S. at 273, 113 S.Ct. 2606; *Burns*, 500 U.S. at 492, 111 S.Ct. 1934; *Butz*, 438 U.S. at 512–13, 98 S.Ct. 2894; *Imbler*, 424 U.S. at 430, 96 S.Ct. 984; *Schloss*, 876 F.2d at 290; *Barrett*, 798 F.2d at 571–72; *Dacey*, 568 F.2d at 278.

A somewhat more difficult question is the proper application of the Second Circuit's decision in *Blouin*. As noted earlier, that decision suggests that to obtain absolute immunity a government attorney must be acting as an advocate *of the state and its citizens*, and not as an advocate of an *individual*. *See Blouin*, 356 F.3d at 358. At first glance, this case might be characterized as one in which the Attorney General was asked to serve as advocate for Captain Mangiafico, not the State, and as such, the Attorney General would be entitled to only qualified immunity under *Blouin*. *Id.* at 357 ("[i]n seeking the appointment of a guardian for [a patient], their principal objective was the protection of her well-being").

It is not at all clear to this Court how far the language of *Blouin* extends. In any event, this case is readily distinguishable from *Blouin* for several reasons. First, § 5–141d(b) of the Connecticut General Statutes clearly provides that the "*state, through the Attorney General, shall provide for the defense of any such state officer, employee or member in any civil*

action." Conn. Gen.Stat. § 5–141d(b). Thus, by statute, the Attorney General acts on behalf of the State in providing for the defense of lawsuits such as the Ziemba Action. Second, the State is bound by statute to indemnify any state officer or employee "if the officer, employee or member is found to have been acting in the discharge of his duties or within the scope of his employment and such act or omission is found not to have been wanton, reckless or malicious." Conn. Gen.Stat. § 5–141d(a). Therefore, the State's interests—financial and otherwise—are directly at stake in the Ziemba Action. Finally, the Attorney General's decision not to defend Captain Mangiafico under § 5–141d(b) was made on behalf of the State, not Captain Mangiafico, and that decision directly (not derivatively, as in *Blouin* ) affected the application of state legal resources, state policy and state prestige. Therefore, the Court does not believe that *Blouin* is an obstacle to applying absolute immunity in this case.

### B.

Having established that historical and common law analogies support the Attorney General's claim of absolute immunity in this case, the Court must next "consider whether absolute immunity is warranted by public-policy factors, notably the risks to the performance of important governmental functions posed in its absence by vexatious litigation." *Blouin,* 356 F.3d at 357. As the Supreme Court made clear in *Burns,* this inquiry does not focus on a "generalized concern" about potential interference with an official's duties, but rather on whether a denial of absolute immunity may interfere with conduct "closely related to the *judicial process.*" *Burns,* 500 U.S. at 494, 111 S.Ct. 1934 (emphasis added).

In many ways, this case—concerning the decision not to defend a civil action—presents the mirror image of *Barrett,* which held that government attorneys are entitled to absolute immunity for their decisions and actions in defending a civil action. The public policy justifications for according absolute immunity in the setting described in *Barrett*—"[t]he controversial nature of the proceeding[ and] the risk that a losing civil defendant will seek to retaliate by a suit attacking the propriety of the government attorney's conduct," *Barrett,* 798 F.2d at 572—apply with equal force to this case. *See also Forsyth,* 472 U.S. at 521–22, 105 S.Ct. 2806 ("The judicial process is an arena of open conflict, and in virtually every case there is, if not always a winner, at least one loser. It is inevitable that many of those who lose will pin the blame on judges, prosecutors, or witnesses and will bring suit against them in an effort to relitigate the underlying conflict.").

Furthermore, the same considerations that underlie the grant of absolute immunity of criminal prosecutors—the need to avoid diversion of energy and attention from the government attorney's public duties and the concern that the government attorney will lose his independence of judgment if sued over his decisions—apply equally to the Attorney General's decision not to defend a civil action against a state employee. Just like the criminal defendant who "often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate," *Imbler,* 424 U.S. at 425, 96 S.Ct. 984, so, too, could a state employee transform his resentment at being denied representation by the State into improper and malicious actions against the Attorney General. In fact, Captain Mangiafico's complaint in this case—alleging that he is being made the scapegoat by the Defendants—appears strikingly similar to

what a criminal defendant might allege against a prosecutor. While qualified immunity can provide some protection in those circumstances, such lawsuits would inevitably lead to discovery and extended judicial proceedings, disrupting the efficient functioning of the Attorney General's office and, most importantly, affecting the Attorney General's conduct of ongoing judicial proceedings involving state employees.[8] Faced with the specter of civil litigation if he refuses to defend a particular civil litigant, the Attorney General's independence may be compromised and to avoid lawsuits, he may choose to defend conduct in the name of the State against his better judgment, in a disservice both to the State and to the judicial process itself.

### C.

The third *Barrett* factor is the availability of alternative means for redressing wrongful conduct by the Attorney General. *See Barrett,* 798 F.2d at 571. That element also points heavily toward granting absolute immunity in this case. Captain Mangiafico has a clear statutory remedy under Connecticut law to remedy the Attorney General's refusal to provide Captain Mangiafico with representation in the Ziemba Action. Section 5–141d(c) of the Connecticut General Statutes expressly states that because of the Attorney General's decision not to appear in the Ziemba Action, Captain Mangiafico will be reimbursed for the expenses and costs he reasonably incurs in having private counsel defend his interests, so long as Captain Mangiafico is found to have acted in the discharge of his duties or scope of his employment and not to have acted wantonly, recklessly or maliciously. *See* Conn. Gen.Stat. § 5–141d(c).

While Captain Mangiafico complains that he must bear the ongoing legal costs of his defense, there has been no showing that the post-litigation remedy provided by Connecticut's sensible legislative scheme is inadequate. There are numerous other situations where legislatures have properly determined that post-adjudication reimbursement of legal fees is sufficient to protect the interests of those who ultimately demonstrate that they are entitled to reimbursement. *See, e.g.,* Clayton Act, 15 U.S.C. § 26 ("In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff."); Securities Act of 1933, 15 U.S.C. § 77k(e) ("In any suit under this or any other section of this subchapter the court may, in its discretion, require an undertaking for the payment of the costs of such suit, including reasonable attorney's fees, and if judgment shall be rendered against a party litigant, upon the motion of the other party litigant, such costs may be assessed in favor of such party litigant (whether or not such undertaking has been required) if the court believes the suit or the defense to have been without merit, in an amount sufficient to reimburse him for the reasonable expenses incurred by him, in connection with such suit."); Hyde Amendment, Pub.L. No. 105–119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes) ("[T]he court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) pending on or after the date of the enactment of this Act, may award to a prevailing party, other than the United States, a reasonable

---

**8.** One need only look at the Ziemba Action itself—originally filed in December 1998 and currently on hold pending an appeal to the Second Circuit, with no firm trial date set—to find a clear example of the potential time, energy, and resources that must be expended even when public officials have qualified immunity.

attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust."); Individuals with Disabilities Education Act, 20 U.S.C. § 1415(i)(3)(B) ("In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party."); Civil Rights Attorney's Fees Act of 1976, 42 U.S.C. § 1988 ("In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C. § 1681 *et seq.*], the Religious Freedom Restoration Act of 1993 [42 U.S.C. § 2000bb *et seq.*], the Religious Land Use and Institutionalized Persons Act of 2000 [42 U.S.C. § 2000cc *et seq.*], title VI of the Civil Rights Act of 1964 [42 U.S.C. § 2000d *et seq.*], or section 13981 of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . .").

Beyond the clear statutory means that Connecticut has provided for redressing an alleged improper decision by the Attorney General not to defend a state employee, aggrieved employees may also be able to employ traditional ancillary judicial processes for redressing wrongful conduct by the Attorney General. *See Barrett,* 798 F.2d at 573 ("[A]n alternative remedy for abuse exists in the availability of professional disciplinary proceedings."); *see also Imbler,* 424 U.S. at 429, 96 S.Ct. 984 ("[A] prosecutor stands perhaps unique, among officials whose acts could deprive persons of constitutional rights, in his amenability to professional discipline by an association of his peers."). Beyond the judicial system, administrative and legislative bodies

are also potentially available to address misconduct by the Attorney General. *See, e.g.,* Conn. Const. art. IX, § 3 ("The governor, and all other executive and judicial officers, shall be liable to impeachment; but judgments in such cases shall not extend further than to removal from office, and disqualification to hold any office of honor, trust or profit under the state."). *Cf. Office of Governor v. Select Committee of Inquiry,* 271 Conn. 540, 578, 858 A.2d 709 (2004) ("[T]he separation of powers provision of our state constitution does not provide the governor with categorical immunity from being subpoenaed to testify before the [Select Committee of Inquiry] engaged in its investigative, fact-finding and advisory duties regarding possible impeachment of the governor."). Finally, Connecticut's citizenry retains the right to vote the Attorney General out of office. *Cf. Nixon v. Fitzgerald,* 457 U.S. 731, 757, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) ("The President is subjected to constant scrutiny by the press. Vigilant oversight by Congress also may serve to deter Presidential abuses of office, as well as to make credible the threat of impeachment. Other incentives to avoid misconduct may include a desire to earn reelection, the need to maintain prestige as an element of Presidential influence, and a President's traditional concern for his historical stature.") (footnote omitted).

Even if these statutory and political safeguards were to fail, and an occasional state employee were to be denied representation by the Attorney General for malicious or dishonest purposes, that is a risk the Court believes must be borne. As Judge Hand famously observed in his decision in *Gregoire:*

As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end

better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.

*Gregoire,* 177 F.2d at 581; *see Imbler,* 424 U.S. at 427–28, 96 S.Ct. 984.

For all the reasons discussed previously, the Court concludes that Attorney General Blumenthal is entitled to absolute immunity for his decision that the State, through his Office, would not represent Captain Mangiafico in the Ziemba Action. Therefore, Count One of Plaintiffs' Amended Complaint [doc. # 34] against Attorney General Blumenthal is dismissed.[9]

## V.

Having dismissed Plaintiffs' claim against Attorney General Blumenthal based on his absolute immunity from suit under the circumstances of this case, the Court now turns to the remainder of Defendants' motion to dismiss, in which Commissioner Lantz seeks to dismiss Captain Mangiafico's First Amendment retaliation claim. Defendants do not seek dismissal of Plaintiff's Fourteenth Amendment equal protection claim under § 1983 against Commissioner Lantz and former DOC Commissioner Armstrong. *See* Defs.' Mem. L. in Supp. of Mot. to Dismiss [doc. # 20], at 1.

Captain Mangiafico claims that he was retaliated against in his employment because he filed this lawsuit, in violation of his First Amendment rights. As recently explained by the Second Circuit,

> [i]n order to establish a First Amendment claim of retaliation as a public employee, [a plaintiff] must show that (1)[his] speech addressed a matter of public concern, (2)[he] suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action. Whether speech addresses a matter of public concern is a question of law to be determined by the content, form, and context of a given statement, as revealed by the whole record.

*Konits v. Valley Stream Cent. High School Dist.,* 394 F.3d 121, 124 (2d Cir.2005) (internal quotation marks and brackets omitted) (citing *Cobb v. Pozzi,* 363 F.3d 89, 102 (2d Cir.2004); *Johnson v. Ganim,* 342 F.3d 105, 113 (2d Cir.2003); *Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). The Second Circuit has noted that "if the basis for a First Amendment retaliation claim is a lawsuit, the subject of the lawsuit must touch upon a public concern." *Konits,* 394 F.3d at 124.

---

**9.** In support of their motion to dismiss, Defendants also presented an argument based on the Supreme Court decision in *Pennhurst State Sch. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), which held, *inter alia,* that the Eleventh Amendment bars federal suits against state officials if they are based entirely on violations of state law. *Id.* at 106, 104 S.Ct. 900 ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."); *see also* Mem. of Law in Supp. of Mot. to Dismiss [doc. # 20], at 12–14. Defendants did not address this argument in their reply brief, see Reply Br. in Supp. of Mot. to Dismiss [doc. # 37], nor did they press this line of argument at oral argument—all for good reason. Captain Mangiafico's claims against Defendants are federal Constitutional claims and the mere fact that the claimed entitlement to a civil defense finds its source in state law does not automatically disable the federal courts under *Pennhurst. See, e.g., Catone v. Spielmann,* 149 F.3d 156, 160 n. 1 (2d Cir. 1998) (while a plaintiff is "barred by the Eleventh Amendment from suing state officials in federal court for a violation of state law," her "claim in federal court can be based on the absence of notice and a hearing (assuming that she was entitled to due process protections)" associated with that state law) (citing *Pennhurst,* 465 U.S. at 120–21, 104 S.Ct. 900).

Viewing the allegations in the Amended Complaint in the light most favorable to Captain Mangiafico, the Court cannot say with certainty at this very preliminary stage of the proceeding that Captain Mangiafico can prove no set of facts related to his First Amendment retaliation claim that would entitle him to relief. *See, e.g., Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 511–14, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). First, Captain Mangiafico claims, among other things, that there has been a coordinated effort among the Defendants to make him a scapegoat in the Ziemba affair. With its allegations of back-room deals made between high level government officials, his lawsuit is certainly one that "addresse[s] a matter of public concern." *Konits,* 394 F.3d at 124; *see, e.g., Ganim,* 342 F.3d at 112–113 (allegations of unlawful and corrupt actions by city officials a matter of public concern); *Harman v. City of New York,* 140 F.3d 111, 118 (2d Cir.1998) ("[D]iscussion regarding current government policies and activities is perhaps the paradigmatic matter of public concern.") (internal quotations and citations omitted).

Second, Captain Mangiafico alleges that in response to the filing of his lawsuit, he was transferred to another correctional facility. Am. Compl. [doc. # 34], at ¶ 34. A transfer may constitute an adverse employment action, so long as it is "accompanied by a negative change in the terms and conditions of employment." *Morris v. Lindau,* 196 F.3d 102, 113 (2d Cir.1999). At this stage of the case, Captain Mangiafico has sufficiently pled that the transfer has adversely affected his employment by subjecting him to diminished career and promotional opportunities and financial losses. *See* Am. Compl. [doc. # 34], at ¶ 39. The Court is required to accept that allegation as true on a motion to dismiss, and if true, Captain Mangiafico

has satisfied the second prong of a First Amendment retaliation claim.

Third and finally, Captain Mangiafico has asserted that he was transferred to another facility only one month after filing his complaint against defendants. *Id.* at ¶ 34. Whether a causal connection existed such that Captain Mangiafico's lawsuit was a "substantial motivating factor" in the adverse employment action—that is, whether "the adverse employment action would not have been taken absent the employee's protected speech"—is a fact-intensive question that Captain Mangiafico is entitled to develop through discovery. *Morris,* 196 F.3d at 110 (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

The Court emphasizes that it makes no prediction of whether Captain Mangiafico will prevail on his First Amendment retaliation claim or even whether he will survive a motion for summary judgment. However, at this early stage, the Court is not prepared to deny Captain Mangiafico the opportunity to conduct discovery and to present evidence in support of his claim against Commissioner Lantz.

## VI.

For the reasons stated, the Court GRANTS Defendants' Motion to Dismiss [doc. # 19] as to Attorney General Blumenthal only. Count One of Plaintiff's Amended Complaint [doc. # 34] against Attorney General Blumenthal is hereby dismissed. The Court DENIES Defendants' Motion to Dismiss [doc. # 19] as to Commissioner Lantz and former Commissioner Armstrong.

IT IS SO ORDERED.